**In re CURLEW VALLEY ASSOCIATES, a Utah general partnership, aka dba Professional Management Associates, Sandarosa Land and Livestock, J. Reid Hoggan, Patrick R. Hoggan, Kent A. Hoggan, Bradley R. Hoggan, and Jefrey A. Hoggan, Debtor.**

**Bankruptcy No. 80–00876.**

United States Bankruptcy Court,
D. Utah.

Oct. 8, 1981.

---

Herschel J. Saperstein, Weston L. Harris, Watkiss & Campbell, Salt Lake City, Utah, for trustee.

David E. Leta, Roe & Fowler, Salt Lake City, Utah, for debtor.

## MEMORANDUM DECISION ON JUDICIAL SUPERINTENDENCE, TERMINATION, AND REPLACEMENT OF A TRUSTEE UNDER CHAPTER 11

RALPH R. MABEY, Bankruptcy Judge.

### INTRODUCTION

This case raises the issues whether a mistake in business judgment by a trustee appointed under Section 1104(a)(1)[1] justifies either judicial interference with his conduct under Section 1108 or his termination and replacement under Section 1105.

Debtor, an agribusiness, owns a 24,000 acre farm in northern Utah and southern Idaho. Its principal crops are alfalfa hay, alfalfa seed, barley, and wheat. It filed a petition under Chapter 11 in May, 1980, and worked the farm as a debtor in possession until a trustee was appointed in December, 1980. The case was dismissed pursuant to Section 1112(b) on April 3, 1981. The dismissal, however, was conditioned upon failure to obtain confirmation of a plan before July 4. This deadline was later extended to August 1.

The trustee discounted the prospects for rehabilitation, and commenced preparations for liquidation which would occur through

---

[1]. All citations in this form, unless otherwise indicated, are to Title 11 of the United States Code.

either dismissal or implementation of a creditors' plan which had been recently filed.[2] His program, in part, involved substitution of hay baling for hay cubing. This, in his view, among other things, allowed greater predictability of expenses, swifter disposition of hay, and more flexibility, since conversion to baling still permits cubing, but the reverse is not true.

Debtor gainsayed the views of the trustee and requested an injunction against his program. Baling, it argues, is agronomically unsound, will result in a $500,000 loss of crop proceeds, and will defeat its opportunity to confirm a plan (which is predicated on cubing).

At a hearing held July 20, on the eve of the hay harvest, the trustee asked for denial of the injunction on the ground that the decision to bale was made in good faith and for sound reasons and therefore could not be countermanded by the court. Debtor, on the other hand, because it feared substantial and irreversible economic consequences, asked the court to look behind the decision, to examine the expertise and data upon which it rested, and to weigh the best interests of the estate.[3]

The court, given the emergency status of the case, ruled from the bench. It concurred with the trustee and refused to hear the debtor's evidence. The debtor immediately moved to terminate the trustee and replace him with the debtor in possession. A hearing on this matter was scheduled for

---

2. The trustee outlined his views in a letter to debtor dated July 6. Debtor argues that the trustee, in effect, was placing the estate in a liquidating posture which would violate the spirit if not the letter of Section 1112(c). *Cf. In re The Blanton Smith Corporation*, 7 B.R. 410, 6 B.C.D. 1389 (Bkrtcy.M.D.Tenn.1980). This argument, however, misconceives the intent of the trustee. He was not liquidating the estate but was preparing for the contingency of liquidation through dismissal or confirmation of the creditors' plan.

3. The position of debtor was underlined by this colloquy between counsel and court:

Mr. Leta: If the evidence indicates that the decision is going to have substantial economic consequences, I don't believe the court can sit back and allow the trustee to make that mistake. How could the court justify the losses that would result from that if in fact the weight of the evidence indicates that it is going to cost more money and have greater economic consequences? It would in effect be condoning a bad decision. It would condone loss.

The court: [How can the court properly find that the trustee's expertise—a Ph.D. in agricultural economy—is inadequate when my expertise—an undergraduate degree in English literature—is non-existent?] Is there any deference to the trustee's expertise which the court is obligated to give his decision, or [should the court substitute itself for the trustee and itself weigh the agricultural and economic evidence presented?]

Mr. Leta: In most judicial [forums], the trier of facts does not have the same expertise as the witnesses. I think in every judicial setting the court must look at the qualifications of the witnesses, but must look at the foundation for the testimony and must make a decision about what weight to give each witness based on that foundation. It would be no different if we were trying an anti trust lawsuit where there were complicated questions of marketing involved in that suit. That would perhaps be beyond the normal day-to-day range of experience, mine, the court's, but that's what the evidence is for, to test that evidence. Test that evidence and decide which evidence is most credible. The trustee may have his own evidence, his own basis. The court can look at that. The court can look at other evidence and decide for itself what would be in the best interest of creditors in this case. Therefore, I don't believe the debtor ought to be [obstructed or] restrained by some more heavier burden than the normal burden of [cause]. The trustee can be removed for cause under the statute. A trustee can be appointed for cause. A decision of the trustee in my view can be reversed for cause. That cause could include ineconomy or could include lack of information, include just a bad calculation. Perhaps the trustee made a mathematical error here, but whatever it is, if there is cause to reverse such a decision, then I think that is the standard that the court ought to apply. We believe in this case there is substantial cause. We believe the evidence will show that this estate will primarily suffer—first of all, the evidence will show that the decision to bale in the first instance has probably already cost the estate over $100,000. That is behind us now. We can't do anything about that decision. That was made by the trustee. The decision to bale the rest of the ranch will result in probably within our ability to reasonably calculate, losses...in excess of $500,000. Under the circumstances, it is proper for the court to hear the evidence and decide and obviously decide for itself whether there is cause to reverse the trustee. (July 20 transcript of hearing, pages 15–19.)

the next day. Renewed argument was held on the scope of the trustee's discretion and on his termination and replacement. The court ruled by telephone in the evening, reaffirming its refusal to interfere with the trustee and denying the motion to terminate and replace him. This memorandum decision elaborates the basis for these rulings.

## JUDICIAL SUPERINTENDENCE OF THE TRUSTEE

■ The governing statute is Section 1108 which provides: "Unless the court orders otherwise, the trustee may operate the debtor's business." Debtor reads Section 1108 to mean that the court may limit, as well as bar, the trustee's operation of the estate. This reading, however, ignores the reason for its enactment, and its construction in light of other provisions and policies of the Bankruptcy Code.

The thrust of Section 1108 is that the trustee may operate the debtor's business. In other words, he may, but need not, manage the estate as a going concern, rather than in liquidation. Section 1108 thus reflects the policy of Chapter 11 to preserve, where possible, the going concern value of enterprises while recognizing that, in some instances, there will be no disparity between going concern and liquidation value, or that going concern may be less than liquidation value. *See, e. g.*, 5 Collier on Bankruptcy ¶ 1108.03 (15th ed. 1980). In these cases, the trustee should have far-reaching discretion to operate, intermit, or debar the debtor's business.

■ Since, however, operation of the debtor's business is the norm, *see, e. g.*,

4. This reasoning is consistent with the analysis in Collier, relied upon by debtor, which states: "Finally, section 1108 does not alter the court's authority to limit the discretion of the trustee with respect to operation of the debtor's business. Section 1108 does not limit the court to a black or white determination at the beginning of the case that the trustee shall, or in the alternative shall not, operate the debtor's business. On the contrary, the court can appropriately direct the trustee to cease operations of a certain designated portion of the debtor's business while permitting the trustee to continue operating the balance of such business." 5 Collier on Bankruptcy, *supra* ¶ 1108.03 at

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 404 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787, the "orders otherwise" language of Section 1108, at most, allows the court to direct the trustee, where he may not elect, to discontinue an enterprise. Hence, the "orders otherwise" language dovetails with Sections 305(a) and 1112(b) which authorize the suspension, dismissal, or conversion of a case. It does not express or imply a power in the court to condition the trustee's management of the estate.[4]

■ The debtor, in contrast, reads Section 1108 as restricting the trustee who, from its standpoint, *must* operate the debtor's business "as he found it." This argument, however, overlooks the permissive "may": the trustee may, but need not, run the business; if he has discretion to cease operations as a whole, he may modify them in part. Likewise, debtor's construction of the term, "debtor's business," is incompatible with Chapter 11 as a whole. Strictly speaking, there is no debtor's business once a petition has been filed creating an estate under Section 541 and a new entity, the debtor in possession, to manage that estate. Moreover, a rule requiring the trustee to mimic the debtor may vitiate the basis for appointment of a trustee which in this case involved fraud and mismanagement, and the need for their correction. Surely debtor cannot mean that the trustee must seek court approval under Section 1108 to rectify abuses which were the reason for his appointment in the first instance.[5]

This interpretation of Section 1108 is consistent with and complements other provisions in the Code. The relationship of Section 1108 with Sections 305(a) and 1112(b)

1108–5. Collier speaks in terms of the cessation, in whole or part, of the business, not its revival or a change in operations.

5. Likewise, debtor's argument that baling complicates its effort to obtain confirmation of a plan assumes that the court must defer to debtors as proponents of plans. Appointment of a trustee, however, not only ousts the debtor as manager of the estate, but also, under Section 1121(c)(1), cuts off the period within which it has an exclusive right to file a plan. Indeed, creditors in this case have filed a plan which provides for liquidation of the estate. It is impractical for the trustee to coordinate his

has already been mentioned. A further example is Section 1107(a) which confers the powers of a trustee on a debtor in possession "subject to. . .such limitations or conditions as the court prescribes." Section 1107(a) thus permits judicial oversight where the debtor in possession acts as trustee. This permission does not appear in Section 1108. Such particularized draftsmanship suggests a desire to monitor debtors in possession but to allow fuller rein for trustees in the management of the estate.[6]

Similar inferences may be drawn from 28 U.S.C. Section 959(a), Section 1104(c) and

management of the estate with all plans; it is unfair for him to favor one plan at the expense of another. He must pursue an independent course. Debtor's assumption that it is entitled to preferment is therefore unwarranted.

**6.** The history of Section 1108 may further elucidate this point. Section 189 of the Act, former 11 U.S.C. Section 589, the predecessor to Section 1108, permitted a trustee or debtor in possession "upon authorization by the judge," to operate the business "during such period, limited or indefinite, as the judge may from time to time fix." Section 188 of the Act, former 11 U.S.C. Section 588, the predecessor to Section 1107(a), gave a debtor in possession the rights of a trustee "subject, however, at all times to the control of the judge and to such limitations, restrictions, terms, and conditions as the judge may from time to time prescribe." Despite the contrasting language of these sections, no distinction was drawn between the control exercised over trustees and debtors in possession. Collier, for example, notes that "the court may impose whatever conditions it deems necessary in the best interest of the estate," 6 Collier on Bankruptcy ¶ 8.12 at 1422 (14th ed. 1978) and elsewhere opines that "certainly the trustee was subject at all times to the judge's command." 13A Collier on Bankruptcy ¶ 10–207.-04 at 10–207–3 (14th ed. 1977). These observations, however, may have been made in light of Rule 10–207, Fed.R.Bankr.P., which modified Section 189 by providing: "The court may authorize the trustee, receiver, or debtor in possession to conduct the business and manage the property of the debtor for such time and on such conditions as may be in the best interests of the estate." The Advisory Committee's Note perceived this change as a liberalization of the court's power vis a vis the trustee: "[p]ermitting the imposition of conditions is for the protection of public investors and creditors and goes beyond Section 189 of the Act in affording greater protection."

The Bankruptcy Commission proposal substituted an "administrator" for the court but otherwise followed Rule 10–207. Parties "aggrieved" by a decision to discontinue operations were permitted to commence a civil proceeding to obtain relief. Report of the Commission on the Bankruptcy Laws of the United States, H.Doc. No. 93–137, pt. II, Section 7–104 (1973). This meant that "[t]he administrator. . .has the initial authority to determine whether or not the business should be operated. In making this decision, he should be influenced in large part by the opinion of the creditor's committee. If the administrator's decision with respect to the operation of the business is challenged by the debtor or any other interested party, resort may be had to the court and a prompt determination of that issue is contemplated." Trost, "Corporate Reorganizations Under Chapter VII of the 'Bankruptcy Act of 1973': Another View," 48 Am.Bank.L.J. 111, 128 (1974). This view was criticized by some who felt that "[s]uch a tremendous concentration of discretion in the Administrator conceivably may result in a liquidation upon the trustee's appointment as a consequence of the Administrator's refusal to permit the trustee or debtor to operate." Weintraub and Levin, "Chapter VII (Reorganizations) As Proposed By The Bankruptcy Commission: The Widening Gap Between Theory And Reality," 47 Am.Bank.L.J. 323, 326 (1973). The rejoinder, of course, was that "[t]oday the same broad discretion with respect to permitting the business to operate is vested in the judicial officer. Does the present concentration of discretion in the judicial officer lead any more to liquidation than tomorrow's concentration of discretion in the administrative officer? Is a judicial officer any more qualified to decide whether to close a business than an administrative officer?" Trost, "Corporate Reorganizations Under Chapter VII of the 'Bankruptcy Act of 1973': Another View," 48 Am.Bank.L.J. 111, 129 (1974). And in any event, closure of the business was ultimately left to the court. Id. at 114.

Others, sidestepping the administrator versus court controversy, nevertheless argued for a change of emphasis "in the area of closing and operating businesses. The Commission has the administrator deciding whether to close a business, and if anyone opposes that decision, he must go to court to get authority to operate the business. The National Bankruptcy Conference would reverse the procedure so that if the administrator wants to close a business, he had to go to court to get permission to do so. Closing a business is almost a dispute by definition. Somebody is going to oppose that usually, so we feel that the business operation should not be discontinued without a court order in advance. Otherwise, it may be too late to reverse the decision as a practical mat-

Section 1105 which allow suits against trustees, substitution of one trustee for another, and replacement of a trustee with the debtor in possession. Congress allowed and delimited these remedies for errant trustees, and thus sought to preclude the implication of others. In specific instances such as Section 1107(a), where it was willing to tolerate judicial surveillance, it knew how to say so.

Aside from these statutory bases, there are policy reasons for discouraging supervision of the trustee. First, as the court has noted elsewhere, reorganization involves the "turbulent rivalry" of many interests. *In re Alyucan Interstate Corp.*, 12 B.R. 803, 806, 7 B.C.D. 1123, 1124 (D. Utah 1981). The trustee's business decisions will affect these interests. If parties, in their own right, or as putative representatives of the estate, question these decisions, the court may be deluged with motions. This would impede the expeditious administration of estates.

Second, "[t]he reorganization process is not basically an adversary process. The reorganization process is one of controlled negotiation, much like labor negotiations are conducted between labor and manage-

ment." Trost, "Corporate Reorganizations Under Chapter VII of the 'Bankruptcy Act of 1973': Another View," 48 Am.Bank.L.J. 111, 120 (1974). These negotiations are conducted by trustees, creditor committees, debtors, and their professional representatives. These parties are equipped, through experience, expertise, and powers under the Code to shepherd the estate toward reorganization. Judicial involvement blunts the give and take which is necessary to this process and ultimately derails the objective of private control in Chapter 11.

Third, disagreements over business policy are not amenable to judicial resolution. The courtroom is not a boardroom. The judge is not a business consultant. While a court may pass upon the legal effect of a business decision, (for example, whether it violates the antitrust laws), this involves a process and the application of criteria fundamentally different from those which produce the decision in the first instance. In short, the decision calls for *business* not *legal judgment.*

Fourth, and most important, a major goal of the bankruptcy reform movement was to divorce the court from ministerial duties and to confine it to adjudicative functions.[7]

ter." Testimony of George M. Treister, Vice-Chairman of the National Bankruptcy Conference, *Hearings Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary*, 94th Cong., 1st Sess., Ser. 27, pt. 1, at 584 (1975).

Section 1108 emerged as a compromise of these disparate views, and altered prior law in at least three respects. First, instead of allowing the court to determine, in the first instance, whether a business may or may not operate, Section 1108 establishes a presumption of operation. Second, this presumption is rebuttable, and the enterprise may be discontinued, not necessarily by the court, but by the parties. Third, Sections 1108 and 1107(a) bifurcate treatment of trustees and debtors in possession, remaining silent concerning judicial authority over the former, but allowing supervision over the latter. The implications are twofold: reduced involvement by the court in the administration of estates, and a distinction between judicial surveillance of trustees and debtors in possession. *See, e. g.,* 5 Collier on Bankruptcy ¶ 1108.03 at 1108–4—1108–5 (15th ed. 1980).

7. The separation of judicial and administrative functions was anticipated by commentators, *see, e. g.,* Gendel, "Summary Jurisdiction in Bankruptcy Related to Possible Referee Disqualification," 51 Cal.L.Rev. 755 (1963) and Triester, "Summary Judgment: Bankruptcy Jurisdiction: Is It Too Summary?" 39 So.Cal.L. Rev. 78 (1966), and was advocated by the Commission and Congress. *See* Report of the Commission on the Bankruptcy Laws of the United States, H.Doc. No. 93–137, pt. I, at 92–93, 248–249 (1973) ("Neither referees nor district judges can adequately police reorganizations. To the extent they attempt to do so, they create an appearance of bias... The assurance of impartiality of the judge is also enhanced by having the administrator decide whether the business should be operated and the extent of any operation by the debtor"); H.R.Rep.No. 95–595, 95th Cong., 1st Sess. 89–91, 95–99, 107–109 (1977) (United States Trustee program and notice and hearing requirement will eliminate ministerial chores, the "bankruptcy ring," and "cronyism"). The idea was discussed and applauded in a score of articles. *See, e. g.,* Coogan, Broude, and Glatt, "Comments on Some Reorganization Provisions of the Pending Bankruptcy Bill," 30 Bus.Law. 398, 401 (1975);

Sound reasons underly this goal. The quintessential predicate for administering justice is a neutral arbiter. A court which appoints a trustee and confers with him regularly and *ex parte* for the purpose of managing a business may find it difficult to rule impartially if those decisions in which it has participated are challenged. Impartiality is not improved by inviting input from others and transferring the decision-making from a private to a public forum. The court is nevertheless cast as a "super-trustee" and overseer of the estate, asked now to determine company policy and later to reconcile the effects of that policy on competing interests. These problems were addressed by Congress:

> A bankruptcy judge may be required to grant a debtor in possession in a reorganization case authority to enter into a contract subject to certain terms and conditions. The judge may actually participate, through the debtor in possession, in negotiating the contract. He may work with the debtor in possession and a union to avert a strike that would ruin the business. He may advise the debtor in possession or the trustee in the management of the business, and issue frequent instructions for its conduct. Later in the case, that same judge may be faced with the responsibility for resolving a dispute that arises over the terms of the contract that he participated in negotiating or over the nature of the union's obligation to the debtor. An individual that is in

effect a "party" to a contract simply cannot render a fair or impartial decision concerning its interpretation.[8]

\* \* \* \* \* \*

These factors add an additional dimension to the position of the bankruptcy judge. As the administrator of bankruptcy cases, and the individual responsible for the supervision of the trustee or debtor in possession, it is an easy matter for a bankruptcy judge to feel personally responsible for the success or failure of a case. Bankruptcy judges frequently view a case as "my case." The institutional bias thus generated magnifies the likelihood of unfair decisions in the bankruptcy court, and has caused at least one occasional bankruptcy practitioner to suggest that "the bankruptcy court is the only court I appear in in which the judge is an interested party."

These problems are particularly acute in business rehabilitation cases. In chapter X corporate reorganization cases, the judge must appoint the trustee, and then work with the trustee in the conduct of the business. The appearance of unfairness generated when the judge's appointee appears before the judge for a hearing is magnified because the judge must work so closely with the trustee in the management of the business undergoing reorganization. Though there is no trustee in a Chapter XI or Chapter XII arrangement case, the judge works closely with the debtor in possession in the man-

Hughes, " 'Wavering Loss' Operating a Business During Reorganization Under Chapter 11 of the New Bankruptcy Code," 54 Am.Bank. L.J. 45, 59–61 (1980); King, "Chapter 11 of the 1978 Bankruptcy Code," 53 Am.Bank.L.J. 107, 112 (1979); Klee, "The New Bankruptcy Act," 64 A.B.A.J. 1865, 1967 (1978); Trost, "Business Reorganizations Under Chapter 11 of the New Bankruptcy Code," 34 Bus.Law. 1309, 1315–1316 (1979); Trost, "Corporate Reorganizations Under Chapter VII of the 'Bankruptcy Act of 1973': Another View," 48 Am.Bank.L.J. 111, 116–121 (1974); Trost and King, "Congress and Bankruptcy Reform Circa 1977," 33 Bus.Law. 489, 495–496, 531–532 (1978). There, of course, may be disagreement over what is a "judicial" and what is an "administrative" function. *See, e. g.*, Testimony of George M. Treister, Vice-Chairman of the National Bank-

ruptcy Conference, *Hearings Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary*, 94th Cong., 1st Sess., Ser. 27, pt. 1, at 583–598 (1975). Triester, for example, discounts the utility of this distinction, and instead draws the line between disputes and uncontested matters. In this regard, he notes that closure of a business "is almost a dispute by definition." *Id.* at 594.

8. Here, for example, if the court determined that, as a matter of business policy, cubing was preferred, how could it rule if the lessor of the cubing equipment requested relief under either Section 362(d) or Section 365(b)(2)? Or how could it rule if debtor sought damages in a suit against the trustee? *Cf. Sherr v. Winkler*, 552 F.2d 1367 (10th Cir. 1977).

agement of the business. It is in these cases in which the judge's personal responsibility for the success or failure of a case is intense, with the consequent appearance of bias in the judge's consideration of disputes that arise in the case. H.R.Rep.No. 95–595, 95th Cong., 1st Sess. 90–91 (1977), U.S. Code Cong. & Admin. News 1978, pp. 6051, 6052.[9]

Compromises in the Reform Act prevent complete separation of administration and adjudication. But inroads were made.

There should be no regression. Unless the Code directs otherwise, a wall of separation should be erected between the court and the estate.[10] Whenever the court must define its role *vis a vis* the estate, it should draw the line in favor of judicial independence.[11]

 In short, the court will not entertain objections to a trustee's conduct of the estate where that conduct involves a business judgment made in good faith, upon a reasonable basis,[11a] and within the scope of

9. Indeed, merger of the judicial and administrative roles may result in identification of the court with the estate, and the evils which flow in the wake of this alliance. As noted in the Commission Report:

> This problem is aggravated in metropolitan centers where there is sufficient concentration of bankruptcy business for a specialized bankruptcy bar to develop. Members of the specialized bar are a valuable source of knowledgeable and capable trustees on whom the [court] is able to draw when creditors do not elect a trustee. The involvement of the [court] in the administration of estates entails numerous conferences and communications that are informal and ex parte. The responsibility resting on a conscientious [court] under the present Act is thus conducive to the development of what appears to attorneys who are not included among the specialists, to their clients, and to the public generally, as an unseemly and continuing relationship between the referee and the members of the specialist bar. He is thus vulnerable to being linked by imputation to the so-called "bankruptcy ring" which is the opprobrious label frequently given to the specialized bankruptcy bar in a community. Report of the Commission on the Bankruptcy Laws of the United States, H.Doc.No. 93–127, pt. I, 93 (1973).

Thus, in Justice Douglas's words, bankruptcy judges may "flourish under Parkinson's Laws" and their power may increase "like that of a prince in a medieval kingdom." *Bankruptcy Rules and Official Bankruptcy Forms*, 411 U.S. 991, 993, 93 S.Ct. 3081, 3082, 37 L.Ed.2d xxxi (1974). Those who abide their governance are rewarded with the largesse and patronage of the fiefdom. Those who do not are treated as serfs, saboteurs, and expatriates.

10. As the court noted in its ruling from the bench: "The code provisions, in requiring court approval for certain actions of the trustee, carry with them the exclusion of the court's involvement in other unspecified actions of the trustee, unless the trustee has exceeded his statutory authority." (July 20 transcript, page 25.)

11. Commentators have echoed these views. Professor Trost, for example, has noted that, on motion, the court may invoke Section 1108 with Section 1112(b) to order a *cessation* of business but that otherwise it should avoid entanglement in the affairs of the estate:

> It is unclear from the statute [Section 1108] whether the court, on its own initiative, may terminate the business operation. Removing the bankruptcy court from its sometimes perceived present duty to monitor the operation and administration of business reorganization cases is an admirable goal, is essential to the separation of judicial and administrative functions and, hopefully, will be observed in spirit by the new and old members of the bankruptcy court alike. Until an appropriate pleading is filed the court's only function with respect to the operation of the business should be to change the composition of the creditors' committee if it is not representative. The bankruptcy judge should not worry about "how's the business doing?" The judge's job is to decide disputes. Although this may mean that assets will be dissipated in some operating cases because of the lack of interest or experience of the administrative personnel, the social costs of preventing such occurrences—the ex parte involvement of the bankruptcy judge in the administrative details of the case—is simply too great. If a party in interest requests the termination of the business the judge is to decide if the business should be terminated or converted to liquidation or the case dismissed. Trost, "Business Reorganizations Under Chapter 11 of the New Bankruptcy Code," 34 Bus.Law. 1309, 1315–1316 (1979)

*See also*, P. Murphy, Creditors' Rights in Bankruptcy, Section 15.06 at 15–8 (1980).

11a. In other words, so long as the trustee can articulate reasons for his conduct (as disinct from a decision made arbitrarily or capriciously), the court will not inquire into the basis for those reasons.

his authority under the Code.[12] This rule is consistent with the "limited purpose" of Section 1108, *see* 5 Collier on Bankruptcy, *supra*, ¶ 1108.03 at 1108–9, and harmonizes that statute with other provisions in the law, such as Sections 305(a), 1104(c), 1105, 1107(a), 1112(b), and 28 U.S.C. Section 959(a). It reduces administrative burdens and furthers the goal of an independent court of bankruptcy. For these reasons, the motion under Section 1108 is denied.[13, 13a]

## TERMINATION AND REPLACEMENT OF THE TRUSTEE

Section 1105 provides: "At any time before confirmation of a plan, on request of a party in interest, and after notice and a hearing, the court may terminate the trustee's appointment and restore the debtor to possession and management of the property of the estate, and operation of the debtor's business."

Section 1105 "does not provide a fixed standard pursuant to which the court is to determine whether the trustee's appointment should be terminated." 5 Collier on Bankruptcy, *supra* ¶ 1105.01 at 1105–1. The legislative history notes that "[t]his section would permit the court to reverse its decision to order the appointment of a trustee in light of new evidence." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 403 (1977), U.S. Code Cong. & Admin. News 1978, p. 6359. "Presumably," according to Collier, "the draftsmen intended that the trustee's appointment be rescinded if the court determines that, based upon facts which were not available at the time of the original hearing under Section 1104(a), the original order of appointment of a trustee was improvidently granted." 5 Collier on Bankruptcy, *supra* ¶ 1105.01 at 1105–1—1105–2.

Collier, however, expands upon this standard. The Code was designed to supply "maximum flexibility with respect to the management of the debtor's affairs during the pendency of the case." It follows that Section 1105 "permits the court to terminate the appointment of a trustee where conditions have changed subsequent to the court's order of appointment and the continued service by a trustee is not in the

---

12. An analogy may be drawn to suits by shareholders against directors who, like trustees, in the exercise of business judgment, make decisions of policy for corporations: "Corporate management is vested in the board of directors. If in the course of management, directors arrive at a decision, within the corporation's powers (*intra vires*) and their authority, for which there is a reasonable basis, and they act in good faith, as the result of their independent discretion and judgment, and uninfluenced by any consideration other than what they honestly believe to be the best interests of the corporation, a court will not interfere with internal management and substitute its judgment for that of the directors to enjoin or set aside the transaction or to surcharge the directors for any resulting loss." H. Henn, Law of Corporations 482 (2d ed. 1970).

13. Debtor argues, as an afternote to the controversy under Section 1108, that the baling program exceeds the trustee's authority under Section 363(b). Section 363(b) forbids the trustee's use of property other than in the ordinary course of business without notice, a hearing, and court approval, with opportunity for those with an interest in the property to demand adequate protection under Section 363(e). Debtor avers that the trustee's actions constitute a use of property, extraordinary in light of debtor's previous business practice, thus invoking Sections 363(b) and 363(e).

Without addressing the issue whether baling is in the ordinary course of business, debtor's characterization of baling as a "use" of property seems inappropos. Indeed, the shift from cubing to baling results in less "use" of equipment. If, however, the hay is the property which, in debtor's view, is being "used," its "use" in baling is essentially the same as in cubing, *viz.*, it is harvested, shipped, and sold. This points up the difficulty in conceptualizing debtor's argument under Section 363(b). The statute was intended to protect the collateral of secured creditors while debtor or a trustee continues to operate the business. It was not intended as a vehicle for challenging the trustee's management decisions. For the same reasons, debtor's arguments under Section 363(e) are inapposite, even assuming that debtor has an "interest in property" within the meaning of that section. *But cf. In re Garland Corporation*, 6 B.R. 456 (D.Mass., Bkrtcy.App.Pan., 1980) (unsecured creditors not entitled to adequate protection on motion under Section 364(c)(2)).

13a. The court implies no decision respecting its role in the superintendence of trustees in cases under Chapter 7.

interests of creditors, equity security holders, and other interests of the estate." *Id.*

This "change in circumstance" test was employed by the court in *In re Eastern Consolidated Utilities, Inc.*, 3 B.R. 591, 1 C.B.C.2d 937 (Bkrtcy.E.D.Pa.1980). There a trustee was appointed because the debtor made post-petition preferential payments. Debtor, which had not opposed appointment of a trustee, later moved to terminate and replace him with the debtor in possession under Section 1105. Neither creditor who had requested appointment of a trustee resisted this motion. The court found that the post-petition payments were "the result of . . . ill-advised legal counsel," and concluded that "the hiring of new counsel, combined with the stated intention of the principals of the debtor to comply with the requirements of the bankruptcy code, render the continued services of a trustee unnecessary." *Id.* at 593, 1 C.B.C.2d at 939. In short, "the circumstances which gave rise to the order appointing a trustee no longer exist." *Id.*

■ Assuming that either the "improvidence" or the "change in circumstances" rationale is correct, neither can be applied in this case. Debtor does not argue that appointment of the trustee was improvident in light of evidence which was earlier unavailable. Nor does it point to a change in those circumstances which called for his appointment, *viz.* fraud and mismanagement.

Moreover, debtor's position confuses the role of Sections 1104(a), 1104(c), and 1105. Section 1104(c) provides for removal of a trustee for cause (assuming an error in business judgment constitutes cause), in which case he is replaced by another trustee not the debtor. Thus, the focus of Section 1104(c), in part, is trustee misconduct. If Section 1105 is read to cover the same ground, it not only renders Section 1104(c) superfluous but also contravenes the legislative intent that, in such instances, the trustee is to be replaced with a "disinterested person." Likewise, the purpose for appointing a trustee under Section 1104(a) could be defeated, if a debtor may be put back in place on grounds unrelated to the reasons for his removal.[14] For these reasons, the motion under Section 1105 is also denied.

---

**14.** Indeed, the legislative history to Section 1104(a)(1) notes that "if the current management of the debtor gambled away rental income before the filing of the petition, a trustee should be appointed after the petition, whether or not post-petition mismanagement can be shown." 124 Cong.Rec. H11,102 (daily ed. September 28, 1978). If pre-petition repentance of the debtor in possession does not obviate the need for a trustee, will a post-appointment change of heart make any greater difference?