In re PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, Debtor.

Bankruptcy No. 88–00043.

United States Bankruptcy Court, D. New Hampshire.

Sept. 2, 1988.

Don Willenburg, Richard Levin, Los Angeles, Cal., for Public Service Co.

Geoffrey M. Kalmus, New York City, J. Michael Deasy, Nashua, N.H., for the unsecured creditors committee.

Howard J. Berman, for the Equity Committee.

Larry M. Smukler, Concord, Sr. Asst. Atty. Gen., Mark W. Vaughn, Daniel J. Callaghan, Manchester, for the State of N.H.

Stephen A. Jonas, Asst. Atty. Gen., Joel B. Rosenthal, Boston, for the Com. of Massachusetts.

Robert A. Backus, Manchester, N.H., for Seacoast Anti–Pollution Group, Citizens within the 10–Mile Radius, Campaign for Rate–Payers' Rights.

George J. Wade, New York City, David J. Dunfey, Hampton, N.H., for Citicorp and Consol. Utilities & Communications, Inc. (CUC).

Christopher T. Katucki, for United Illuminating, New England Power, EUA Power Corp., Canal Elec. Co., Connecticut Light & Power Co., and Montaup Elec. Co.

Connie L. Rakowsky, Concord, N.H., for New England Elec. Service.

MEMORANDUM OPINION RE PROPOSED RESTRUCTURING RELATING TO OPERATION OF SEABROOK NUCLEAR POWER GENERATING STATION

JAMES E. YACOS, Bankruptcy Judge.

On July 21, 1988 the debtor in this reorganization proceeding filed a "Notice Of Intention To Enter Into Transactions Out Of The Ordinary Course (New Hampshire Yankee Electric Corporation)" under which the debtor gave notice that it proposed to enter into several related transactions under which the management and operational control with regard to the Seabrook nuclear plant would be transferred from a division of the debtor, i.e., the New Hampshire Yankee Division ("Division") of Public Service, to a separate corporation, i.e., the New Hampshire Yankee Electric Corporation, which corporation had been formed in 1984 in contemplation of the ultimate transfer of those powers and responsibilities to a separate corporation to be controlled by a board of directors representing each of the joint owners of the Seabrook plant.[1]

---

1. The debtor in this reorganization proceeding, PSNH, holds a 36.57 percent share of the plant under the joint ownership agreement.

The Notice of Intention succinctly summarizes the existing situation regarding the Seabrook plant as follows:

At present, Seabrook is owned by Public Service and eleven other New England utilities (the "Joint Owners"). Among the Joint Owners, only Public Service is designated as "technically qualified" under the licenses and permits from the United States Nuclear Regulatory Commission ("NRC") relating to Seabrook (the "NRC Licenses"). Since 1984, the New Hampshire Yankee Division (the "Division") of Public Service, as agent for certain purposes for all the Joint Owners, has conducted the day-to-day operations and management of Seabrook. The Joint Owners supervise the Division's activities both directly (as a group) and through an executive committee composed of representatives of certain Joint Owners.

The Notice of Intention further summarizes the proposed changes to be made in the existing situation as follows:

Under the proposed restructuring, the Division will be reconstituted as an independent corporation, the New Hampshire Yankee Electric Company ("NHYEC"), which will replace the Division as managing agent for the Seabrook project. NHYEC was formed by the Joint Owners for this purpose in 1984. NHYEC will employ those personnel the Division presently employs, so there will be no disruption of operations. Various licenses and permits necessary to operate Seabrook Station will be amended to include NHYEC and to designate NHYEC as the sole licensee "technically qualified" to operate Seabrook Station. Finally, each Joint Owner will be represented on the NHYEC Board of Governors by a representative having a vote weighted in proportion to its ownership share and, when the restructuring is fully implemented, each will own shares of NHYEC stock in the same proportion.

The proposed restructuring would be accomplished by the following specific actions: (1) Shareholder Agreement; (2) Managing Agent Operating Agreement; (3) Amendment of the Joint Ownership Agreement; (4) Issuance and purchase of stock in NHYEC; and (5) Split of Public Service's employee pension plan and transfer of funds to an NHYEC employee pension fund. However, the Notice of Intention covered only items 1 through 4 set forth above. It is contemplated that a subsequent notice and proposal would address the split of the employee pension plan and fund.

## THE RECORD BEFORE THE COURT

No evidence was proffered by the debtor or any other party at the hearing held by this court on August 26, 1988 upon the proposed restructuring. The entire evidentiary record in support of the restructuring is contained in a declaration of Robert J. Harrison, president and chief executive officer of PSNH, which was filed in conjunction with the Notice of Intention on July 21, 1988. After a number of paragraphs summarizing the terms and details of the proposed restructuring, the declaration contains the following recitation of the benefits of the proposal to "both Public Service and the Seabrook project as a whole" as follows:

9.1. Instability in the willingness or ability of Public Service and other Joint Owners to meet their financial responsibilities to the Seabrook project jeopardizes the confidence and morale of the existing staff at Seabrook Station. The existence of NHYEC as the longterm operator of Seabrook Station will likely improve that confidence and morale, retaining the loyalty of the existing personnel and attracting new employees as necessary.

9.2. The existence of NHYEC as a separate corporate entity will permit continuity of the direct management of the Seabrook project, independent of changes in ownership of Seabrook or in the status of individual owners. Such continuity is important to perceptions of continued management dependability and prudence.

9.3. The existence of NHYEC as a corporate entity devoted solely to Seabrook Station will permit the Joint Owners to isolate in NHYEC all activities directed

to that and, thus segregating them from other utility business activities of the Joint Owners.

9.4. Because NHYEC will be owned *pro rata* by the Joint Owners, and because the Joint Owners will have a direct voice proportionate to their ownership shares through representation on the NHYEC Board of Governors, the Joint Owners will share certain Seabrook responsibilities to a greater degree than under the present structure.

The declaration of Mr. Harrison goes on further to summarize and conclude as to the "particular benefit to Public Service, as distinct from the other Joint Owners" as follows:

10.1. The assumption of Seabrook management responsibilities by NHYEC would relieve Public Service and its Division of the primary ultimate responsibility for the safe operation of Seabrook Station and the implementation of its quality assurance programs. Assumption of these responsibilities by NHYEC, the personnel of which now perform such operation and implementation, would place Public Service in a position on par with the other Joint Owners by making it responsible for operations in proportion to its ownership share.

10.2. Employment by NHYEC of the personnel currently employed through the Division would reduce Public Service's personnel record keeping responsibilities, remove the pension and benefit obligations associated with those employees, and reduce future risk of employment-related claims.

10.3. The Seabrook restructuring would permit Public Service greater flexibility in devising and implementing reorganization proposals. The NRC Licenses currently contain certain unique obligations and responsibilities relating to Seabrook management which attach only to Public Service. These are in addition to Public Service's *pro rata* obligations as a Joint Owner of Seabrook Station. Any change in the NRC Licenses requires specific NRC authorization, which could be time consuming if contested. Any reorganization proposal which might contemplate a transfer of Public Service's license obligations or responsibilities could be delayed while such authorization was contested. Therefore, it would be advantageous to Public Service and all parties interested in the pending Chapter 11 proceeding to separate and expedite regulatory proceedings relating to the transfer of Seabrook management responsibilities so as to remove that issue from future consideration of potential future reorganization proposals.

Under the special motion and notice procedural orders entered in this proceeding, any objections to the notice of intention filed July 21, 1988 were required to be filed on or before August 5, 1988. An objection was filed by the Attorney General for the Commonwealth of Massachusetts. Objection was also filed by three citizen groups, i.e., the Campaign For Ratepayers Rights, The Seacoast Antipollution League, and the Citizens Within The Ten Mile Radius, hereinafter referred to jointly as the "citizen groups" for convenience.

A response constituting a "non-objection" of sorts was filed by Consolidated Utilities And Communications, Inc. ("CUC") and Citicorp, holders of third mortgage debenture bonds who have been active in these proceedings. This response notes that CUC and Citicorp do not object to the Notice of Intention but recites further immediately after that statement:

Based upon various representations of PSNH and its professionals, it is the understanding of CUC and Citicorp that the creation by PSNH and others of NHYEC:

(1) will not affect in any way the jurisdiction of this Court over PSNH's Seabrook-related assets; and

(2) will not affect in any way the necessity on the part of PSNH to receive this Court's approval prior to operating Seabrook pursuant to a low power operating license granted by the Nuclear Regulatory Commission.

Based upon the above-mentioned representations and understanding, CUC and

Citicorp do not object to the creation by PSNH and others of NHYEC.

Responses to the Notice of Intention supporting the proposed restructuring were filed by the Official Unsecured Creditors' Committee; by the Official Equity Holders' Committee; by the State of New Hampshire, and by a group of utilities constituting owners of approximately fifty percent of the Seabrook nuclear project commonly referred to as the "Fifty–Percent Joint Owners" group in these proceedings.

The objection by the Commonwealth of Massachusetts notes that whereas the State of New Hampshire in 1984 and 1985 approved the purchase of stock in NHYEC by PSNH,[2] the Commonwealth of Massachusetts has never granted that authorization, and in fact requests have been pending before the Massachusetts Department Of Public Utilities since 1984 regarding the five Massachusetts utilities involved as joint owners of the Seabrook project. However, the terms of the proposed restructuring before this court specifically obviate the need for the Massachusetts utilities to purchase NHYEC stock, in that the other joint owners have agreed to give the Massachusetts utilities pro rata representation on the board of governors of NHYEC based on their ownership interest in the Seabrook project notwithstanding their interim non-stockholder status with regard to NHYEC.

The Commonwealth objects further that the restructuring proposed by the debtor, in advance of a complete reorganization plan, should be disapproved on the grounds that it is premature:

> The proposal seeks to reorganize one division of PSNH and place it permanently and irrevocably in another corporate entity. It appears to be a piecemeal reorganization of PSNH submitted in advance of the complete reorganization plan. The consideration to PSNH for the assets to be transferred is unclear, as is the impact on pre- and post-petition creditors of

the New Hampshire Yankee Division. PSNH was recently given an extension of the time to submit a complete reorganization plan until December 27, 1988. The present proposal by PSNH could be evaluated more usefully by all parties and the court in the context of the complete forthcoming reorganization plan being prepared by the company.

The Commonwealth also argued that the record put forth by the debtor to support the proposal was insufficient:

> The grounds advanced for the proposal are largely speculative and conjectural. There is little record support for assertions that the PSNH proposal provides the claimed benefits. For example, indications that this proposal "might enhance" certain aspects of the licensing proceedings or "might realize" cost benefits provide little detail for the court or parties in evaluating the proposal. Beyond broad assertions, the proposal and affidavit filed by the Debtor provide little information or support as to the need for this reconstitution at this time.

The three citizen groups objected primarily out of a concern that the proposed restructuring would result in a loss of bankruptcy court jurisdiction to prevent low-power testing of the Seabrook plant, in advance of a determination that it is likely that PSNH's reorganization plan will provide, and can guarantee, the ultimate full operation of Seabrook and production of electric power from the plant on a commercial basis. The citizen groups note some interrelated economic questions and Nuclear Regulatory Commission procedures that could result very shortly in presenting the question of whether low-power operation of Seabrook should be authorized:

> The NRC.... has a rule permitting low power operation of nuclear plans up to 5 percent of rated power, even though radiological emergency plans for a ten-mile area around the reactors, required

**2.** *See Re New Hampshire Yankee Electric Corporation,* 69 N.H.P.U.C. 590 (1984) (ordering *inter alia* that NHYEC is authorized to engage in business as a public utility solely for the purpose of managing the construction of Sea-

brook); *Re New Hampshire Yankee Electric Corporation,* 70 N.H.P.U.C. 563 (1985) (ordering *inter alia* that NHYEC's authority be enlarged to include the purpose of managing the operation of Seabrook.

for a full power operation, have not been yet reviewed or approved. (10 CFR 50.-47(d)) It is pursuant to this regulation that the Shoreham nuclear plant, on Long Island in New York, was permitted to commence low power operation in July of 1985, although it now seems unlikely that this plant will ever produce commercial power.

The citizen groups point to the record of prior proceedings in this case indicating that radioactive contamination of the Seabrook plant, by introduction of nuclear fuel and low-power testing, followed by an ultimate decision not to put Seabrook into commercial operation, would convert the plant from an asset, having a positive salvage value, to a substantial liability, due to the high costs of decontamination and disposal of radioactive materials. One indication in that record is that the "swing" in value could be as high as $138 million dollars.[2a] They also argue that contamination of the plant would preclude—due to the costs involved—the option of converting the plant to non-nuclear fuel operation.

The court heard several hours of oral argument from all parties present at the August 26, 1988 hearing on the debtor's proposed action, and took the matter under advisement to better review the record in this matter. Having reviewed that record, it is now necessary to consider the status of the parties objecting, the appropriate legal standard for the court's decision on such a matter, and the result to be obtained by applying that standard to these facts.

## THE STATUS OF THE OBJECTORS

The debtor and the official committees have objected to the "standing" of the Commonwealth and the citizen groups to object to the intended action. While this objection was made in the pleadings, no party at the August 26th hearing orally objected to the Commonwealth and the citizen groups being "heard" by the court. I have previously noted that "standing" has to do with the right to appeal an order in a reorganization proceeding—a far different matter than the question of status to be heard during the course of a hearing *in the reorganization court* as an entity having an arguable interest in a particular matter before the court under § 1109 of the Bankruptcy Code. See *In re PSNH*, 88 B.R. 546, 557, (Bankr.N.H.1988).

The reorganization court I believe has sufficient discretion to "hear" any entity at any hearing to the extent that the entity may be able to provide an aid to the court in understanding the matter before it.[3] Accordingly, whatever an appellate court might decide as to "standing" for appeal purposes, this court sees no reason not to glean from the objections of the Commonwealth and the citizen groups such help as it may find in evaluating the matter for decision, inasmuch as said objectors did not attempt to delay or overburden these proceedings with extensive presentations not germane to the issue before court.

The court is aware that the Commonwealth and the citizen groups are committed to blocking the operation of the Seabrook nuclear plant for various noneconomic reasons relating to asserted environmental and safety dangers posed by the operation of the plant. The debtor and the committees argue credibly that these objectors may be expected to oppose any decision in this reorganization case which has the prospect of advancing the day upon which Seabrook may become operational.[4]

---

**2a.** The court does not accept that prior record as establishing the exact costs of decontamination and a subsequent cleanup for present purposes. There is no serious question however that such costs are very substantial.

**3.** As noted at the hearing this court will look for the truth wherever it can find it. "Even the devil may speak truth"—as someone once said.

**4.** Indeed, the objection by the citizen groups by implication indicates as much:

"We recognize that the Court has indicated that it does not want to make Seabrook licensing decisions on matters pertaining to public health and safety and hence might conclude this is not a matter within its area of concern. (See Memorandum Opinion on Plan Exclusivity Extension, page 38) *However, the issues of public health and safety at Seabrook are inextricably bound up with the financial and valuation issues that this Court must decide.* The interrelationship of health and safety issues,

Nonetheless, the objectors do raise, regardless of motives, a considerable "economic" question posed by the intended action of the debtor, i.e., will this action if approved lead to the possibility of a diminution in the value of the assets of this estate by *an unwise and premature* activation of the nuclear chain reaction at the Seabrook plant which will be beyond any effective control which this court arguably now may have to under its present jurisdiction in these reorganization proceedings? It is also relevant that at least one "economic" party in these proceedings, i.e., CUC and Citicorp, have echoed the same concern in their responsive pleading set forth above.

Accordingly, I find and conclude that the Commonwealth and the citizen groups have raised a pertinent question for consideration by the court on this matter and are not precluded from being "heard" in that sense. In so doing I have no need to express any opinion as to their general standing, if any, to appeal any orders entered by this court during the course of these reorganization proceedings. That is a matter appropriately left to the appellate courts.

## THE LEGAL STANDARD

The debtor seeks to portray the matter before the court as simply a matter of "business judgment" on a "business operational matter" as to which the court should give its approval simply upon a surface showing of a "good faith business judgment" on the part of the debtor in making

and the necessity for the Court's continuing jurisdiction over New Hampshire Yankee, may shortly come up in a very specific context: whether or not low power operation of Seabrook should be authorized." [Emphasis supplied]

The highlighted statement is erroneous to the extent that it implies that it would be relevant for this court to consider public health and the safety issues as factors in the financial reorganization determinations necessary in this chapter 11 proceeding, other than to assure that the reorganized debtor is able to meet health and safety operational requirements prescribed by the appropriate public agencies. Cf. *In re PSNH,* 88 B.R. 558, 562 fn. (Bankr.N.H.1988). Likewise, the province of the NRC in my judg-

the decision to put forth the proposed restructuring. The debtor cites in this regard the decision in *In re Curlew Valley Associations,* 14 B.R. 506 (Bankr.D.Utah 1981). The court there actually expressed its standard in terms of a business operational matter that "involves a business judgment *made in good faith, upon a reasonable basis,* and within the scope of his [chapter 11 trustee's] authority under the Code." 14 B.R. at 513–514 (footnotes omitted) (emphasis added). It *is* fair to state that the court in *Curlew* did exhibit considerable deference to the business judgment of the chapter 11 trustee as to the particular manner of his operation of the debtor's farm business in that case—to the extent of refusing to even *hear* the evidence proffered by the debtor who sought injunctive relief against the methods employed in the trustee's operation as being economically unwise. 14 B.R. at 508.

What needs to be noted about the *Curlew* decision in the present context, however, is that it was a case that clearly involved an activity that was an *"ordinary course"* matter involved in the business operation, i.e., whether the trustee in operating the debtor's farm should "bale" hay rather than "cube" the same.[5] The present case before this court on the contrary involves a proposed restructuring of the debtor which clearly *is* out of the ordinary course of the debtor's activity for reorganization purposes. Accordingly, I refuse to accept the debtor's invitation to accept the *Curlew* decision as persuasive on the present matter.[6]

ment is to determine whether those requirements are presently satisfied or—if not—what additional assurances will be required of PSNH or any other party involved in the reorganization plan. It obviously is not a permitted function of the NRC to deny approvals simply because PSNH is in reorganization. See, *Bankruptcy Code,* § 525 (11 U.S.C. § 525).

**5.** The opinion in *Curlew* makes it clear that the court did not consider it necessary to its analysis that the business practice in question might be considered out of the ordinary course of the debtor's business. 14 B.R. at 514, n. 13.

**6.** It may be noted that prior to the *Curlew* decision the "business judgment" standard for decisions by a bankruptcy court was applied almost

In my judgment the labeling of a particular proposed transaction occurring out of the ordinary course of a reorganization debtor's business, as simply a "business judgment" by the debtor, does not insulate the proposed transaction from a more searching view as to its wisdom and reasonableness than was given the hay-harvesting transaction in the *Curlew* case which occurred in the *ordinary* course of the business operation there involved.

I note that the Court of Appeals for the Fifth Circuit, in *Richmond Leasing Company v. Capital Bank, N.A.,* 762 F.2d 1303; 49 B.R. (222) (5th Cir.1985), while citing the *Curlew* case on the § 365 point, in affirming an order approving an assumption of a lease proposed by a debtor in reorganization, expressed the appropriate standard in terms of a "valid exercise of.... business judgment" [762 F.2d at 1308] and summarized the extensive testimony taken by the court below with regard to the economic factors involved which indicated an enhancement of the debtor's estate. 762 F.2d at 1309.[7]

Moreover, while the court in *Richmond Leasing* also considered the business judgment standard to apply even in the context of §§ 1107 and 1108—to the extent that the assumption of the lease there involved might be argued to represent "a true renegotiation" of the lease, the court in that context found it necessary to go further and consider whether the amended lease might be deemed to be a "Sub Rosa Plan Of Reorganization" before that attack upon the proposed action was also considered to be insufficient. 762 F.2d at 1311–1312. *See also, In re Lionel Corporation,* 722 F.2d 1063, 1071 (2nd Cir.1983) (proposed sale transaction subject to "sound business judgment" standard which requires a showing of "a good business reason" other than appeasement of major creditors).

█ Considering the particular business transaction here involved, i.e., a restructuring of the very entity in reorganization, I believe that an appropriate standard for approval or disapproval of the transaction by the reorganization court is whether good cause has been shown to implement the transaction of this stage of this proceeding i.e., does it have valid business reasons supporting it and does it make good sense in the overall context of the reorganization process? Phrased negatively, the standard might be whether the proposed transaction might improperly and indirectly lock the estate into any particular plan mode prematurely, and without the protection afforded by the procedures surrounding a disclosure statement and confirmation hearing, in a plan of reorganiza-

exclusively in terms of a debtor's decision to accept or reject an executory contract under what is now § 365 of the Bankruptcy Code. As with so many other interesting twists and developments of legal doctrine, the deference to business judgment or discretion stemmed from the decision of the U.S. Supreme Court in *A Group Of Institutional Investors v. Milwaukee Railway Co.,* 318 U.S. 523, 550–551, 63 S.Ct. 727, 742–743, 87 L.Ed. 959 (1943), in which the "party" to whose discretion deference was given, on a lease assumption/rejection issue, was the Interstate Commerce Commission, as an administrative agency given special powers with regard to railroad reorganizations under § 77 of the Bankruptcy Act of 1898. It is also noted that the cases cited by the debtor as following the *Curlew* decision for present purposes, *In re Airlift Intern., Inc.,* 18 B.R. 787 (Bankr.S.D.Fla. 1982); *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.,* 756 F.2d 1043, 1047 (4th Cir.1985), *cert. denied,* 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592; *In re Afco Enterprises,*

*Inc.,* 35 B.R. 512 (Bankr.D.Utah 1983), actually did not involve the §§ 1107–1108 context, but rather the narrower question of lease assumption/rejections, in the first two cases cited, and a narrow question of surcharge against a secured creditor under § 506(c) of the Code, in the third case. None of these decisions, other than the *Curlew* case, stand for the broad proposition that a proposed action by the debtor *out of the ordinary course* of its normal business operations must be approved by a bankruptcy court simply upon a surface showing of business judgment, notwithstanding an arguably unwise impact upon the reorganization process in the particular case.

7. The court in *Richmond Leasing* also noted, in footnote 11, that it saw no essential difference between its "valid" or "proper" standard and the "economic soundness" standard employed in *Matter of Southern Biotech, Inc.,* 37 B.R. 318 (Bankr.M.D.Fla.1983).

tion.[7a]

In my view it is simplistic to borrow from relatively simple assumption-rejection cases (or a hay-harvesting case) a broad, unitary surface standard to be applied to the continuum of transactions that can be encompassed under the rubric of an "out-of-the-ordinary course" business transaction in a complex reorganization case. The degree of scrutiny necessarily must be elastic—becoming more strict and searching the nearer the transaction gets to the heart of the reorganization plan process in terms of channeling that process toward any particular plan option.

### THE PROPOSED TRANSACTION

■ Without approval of the intended action pending before the court the debtor PSNH will remain the "technically qualified" utility entitled to operate the Seabrook nuclear plant when fully-authorized to do so by the NRC. PSNH would operate Seabrook itself, acting by one of its corporate divisions, and acting on behalf of itself and the other joint owners of this Seabrook project.

Under the proposed transaction the entity directly responsible for Seabrook operation would become a separate corporation not a debtor in these reorganization proceedings. The change in operational responsibilities would require NRC approval of the transfer of PSNH's license obligations and responsibilities to that extent to the new separate corporate entity. It would also require that the NHYEC entity also be determined to be a "technically qualified" party to operate the Seabrook project. If that approval is given, and NHYEC becomes the direct operator in control of the Seabrook nuclear plant, the question of its putting the plant into the low-power testing mode when authorized by NRC arguably would not need to be brought to this court for approval, with regard to the timing and the effect of any such action upon the ongoing process of plan formulation.

It is not necessary for this court at this time to determine whether such a transfer of operational responsibilities for the Seabrook project would defeat subject-matter jurisdiction of this court, for injunctive relief to prevent low-power testing operation, if such injunctive relief were determined to be appropriate on the facts and circumstances then existing. It also unnecessary for the court to determine whether in fact it has any such jurisdiction now. It is sufficient to note that the transfer of operational control to a separate non-debtor corporate entity raises an *additional* question as to the existence of that subject-matter jurisdiction.[8]

Since the debtor has been given an extension until December 27, 1988 of its exclusive period to file a plan of reorganization in this case, by my order of June 22, 1988, the "business judgment" of the debtor in advancing the NHYEC proposal at this time raises the obvious question as to what urgency there is to bring this matter before the court other than in conjunction with its plan of reorganization. If the matter is considered in the plan context then all ramifications of the transaction in terms of reorganization prospects could be evaluated in that specific context.

The debtor points to various improvements in morale of the employees dealing

---

**7a.** I cannot believe that when Congress removed the court and a mandatory disinterested trustee from the plan formulation process in reorganization cases, in the 1978 Bankruptcy Code, with the more extensive disclosure statement requirements under § 1125 as a necessary substitute for the former supervisory protections, Congress could have intended that this remaining safeguard could easily be avoided by indirection and use of the "business operation" and "business judgment" labels.

**8.** There is an unresolved question in these proceedings regarding the power of the majority of the joint owners of the Seabrook project to direct actions with regard to the project contrary to the wishes of PSNH without first securing approval of this court for such action. It would be highly inappropriate to unnecessarily precipitate a decision on that question before and if it is necessary to do so in these reorganization proceedings. That is the whole point of the underlying rationale of chapter 11 to promote the prospects for a "consensual" plan of reorganization to eliminate needless and time consuming litigation contrary to the interests of all involved.

with the Seabrook operation, from being part of a separate entity, and the relieving of the debtor from some costs and over-involvement in Seabrook operations as opposed to the other joint owners, as benefits from the proposed transaction. The debtor notes that "The joint owners will share under certain Seabrook responsibilities to a greater degree than under the present structure." However, the debtor and the other joint owners have operated under the present structure since 1984, with no apparent problems, and there is nothing to indicate that a plan of reorganization could not be put forward even if the operation of Seabrook plant continues to be the direct responsibility of a corporate division of PSNH. It is difficult for this court to believe that the improvements in morale adverted to, and the savings of some undefined, unquantified costs to this debtor between now and December, are of sufficient importance to justify approval of this transaction prior to the filing of the reorganization plan, if that were sole ground in support of the transaction.

The debtor adds however, that a particular benefit to PSNH itself would include, as quoted above, the rather cryptic comment by Mr. Harrison in his declaration to the effect that:

> Any change in the NRC Licenses requires specific NRC authorization, which could be time consuming if contested. Any reorganization proposal which might contemplate a transfer of Public Service's license obligations or responsibilities could be delayed while such authorization was contested. Therefore, it would be advantageous to Public Service and all parties interested in the pending Chapter 11 proceeding to separate and

expedite regulatory proceedings relating to the transfer of Seabrook management responsibilities so as to remove that issue from future consideration of potential future reorganization proposals.

Mr. Harrison was not called to testify at the hearing on August 26, 1988. The debtor's motion and memorandum with regard to this point sheds no further illumination upon this point and simply parrots the recitation by Mr. Harrison. Debtor's counsel did make it clear during the course of the hearing that they do not agree with any implication from the CUC/Citicorp statements that they concede that the question of initiating low-power testing at the Seabrook plant is a question which would have to be brought before this court if the NHYEC transaction were to go into effect.[9]

The court is left with the conviction that it was not presented the "whole story" with regard to the underlying reasons and anticipated effects of the proposed transaction at the August 26, 1988 hearing. It would appear that the debtor and its counsel were operating under an assumption that this court would apply mechanically the surface-judgment approach employed in the *Curlew* decision. For the reasons stated above, however, I decline to use that approach to a matter of this importance in the context of this reorganization case. It may well be that the debtor for good and sufficient tactical reasons does not wish to telegraph at this stage its game plan with regard to a plan of reorganization. However that may be, the result is to leave this court in the quandary of trying to evaluate the proposed transaction without a full picture of its effects and ramifications.[10]

9. To be fair, the debtor's counsel also does not concede that that question necessarily has to be brought before this court in the existing situation.

10. The declaration of Mr. Harrison could be read as setting the stage for one of the plan options set forth by the debtor in its exclusivity motion, i.e., creating a separate entity that ultimately could be made a "wholesaler" subject only to FERC regulation rather than the present state-based regulatory control of consumer rates. Cf. *Mississippi Power & Light Co., v. Mis-*

*sissippi,* —— U.S. ——, 108 S.Ct. 2428, 101 L.Ed. 2d 322 (1988). The present transaction by itself would not lead to that result, since the actions by the New Hampshire Public Utility Commission in 1984 and 1985, cited above, specifically precludes the new corporate entity NHYEC from having authority to sell electricity. There was no request for that enlargement of authority in the applications then pending before the NHPUC. In its 1984 decision the PUC specifically noted that "New Hampshire Yankee would not be involved in the application for rates or the selling of power. New Hampshire Yankee

## CONCLUSION

It is a daunting task for any reorganization court to rule contra to a proposed action that is supported by all the major economic and regulatory interests directly involved in this case.[11] Upon a better evidentiary record this court might well have been in a position to approve the intended action. However, on the present record I do not believe that the court has a sufficient basis and showing of good cause to approve the intended action at this stage of this case, in light of the substantial question as to possible loss of jurisdiction with regard to the low-power testing matter discussed above. Debtor's counsel was given the opportunity by the court during the hearing to explain and amplify how denial of this approval might delay or impair the flexibility of the debtor in plan formulation. Counsel declined to take up that invitation. Accordingly, I can only go upon the recitations made in the Harrison declaration and, as indicated, I find them insufficient on balance to justify approval of the proposed transaction. In reaching this conclusion I express no opinion as to the merits of any potential future controversary as to low-power testing or any related matter.

A word should be added as to the "understanding" between CUC/Citicorp and the debtor, to the effect that the debtor would not seek to use the approval of this transaction in any further hearing in which jurisdiction of this court to prevent implementation of low-power testing might be raised. While that understanding might give some comfort to CUC/Citicorp, and perhaps to the committees, it does not give any relevant comfort to this court as to preserving the existing jurisdictional situation. It is elementary that federal courts, being courts of limited jurisdiction, may have their subject-matter jurisdiction challenged at any stage of the proceedings by any party, and by the court itself when the issue is apparent. *See* 20 Am.Jur.2d

COURTS § 95 (1965), *citing Gainesville v. Brown–Crummer Invest. Co.*, 277 U.S. 54, 48 S.Ct. 454, 72 L.Ed. 781 (1928), *Panhandle Eastern Pipe Line Co. v. Federal Power Com.*, 324 U.S. 635, 65 S.Ct. 821, 89 L.Ed. 1241 (1945), *Grubb v. Ohio Public Utilities Com.*, 281 U.S. 470, 50 S.Ct. 374, 74 L.Ed. 972 (1930). Parties to proceedings in the federal court cannot "stipulate jurisdiction" if in fact there is no subject-matter jurisdiction in the federal court as to a particular matter. Accordingly, while tempting, I do not believe that an attempt to "preserve jurisdiction" by some such understanding, or even a provision in this court's order approving the transaction, would be effectual.

A separate order in accordance with this opinion will be entered denying approval of the intended action under the debtor's Notice of Intention filed July 21, 1988.

---

would not sell Seabrook energy to PSNH on a wholesale basis." It could be that this possibility represents the real time urgency in submitting the proposed transaction to the court at this time, rather than the matter of low-power testing, which was the focus of discussion at the

hearing, but the fact is that the court simply has no basis for evaluating the latter justification, if it exists, on the present record.

**11.** But Cf. *In re Lionel Corporation, supra,* at 1071.