In the Matter of LIFEGUARD INDUSTRIES, INC., Debtor.

Bankruptcy No. 1–82–01633.

United States Bankruptcy Court, S.D. Ohio, W.D.

Aug. 30, 1983.

4

Joel S. Moskowitz, Cincinnati, Ohio, for Lifeguard Indus., Inc.

Robert A. Goering, Cincinnati, Ohio, for Board of Directors.

William H. Schorling, Pittsburgh, Pa., for Creditors' Committee.

Robert J. Sidman, Frederick R. Reed, Columbus, Ohio, for BancOhio.

## FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

RANDALL J. NEWSOME, Bankruptcy Judge.

This Chapter 11 case is before the Court pursuant to an Application for Approval of New Management, a Motion to Confirm Appointment of New Directors, and a Motion for Appointment of Committee of Equity Security Holders. A hearing on said motions was commenced on August 16, 1983, and completed on August 23, 1983.

One of the major issues raised by the Applications for Approval of New Management and Motion to Confirm Appointment of New Directors requires a declaration by the Court of how much stock in the corporation is owned by each of the stockholders. Arguably, this issue should have been raised by way of an adversary proceeding rather than by motion. Bankruptcy Rule 7001. However, all of the parties have viewed this issue, as well as the remainder of the issues in this proceeding, as being intensely adversarial in nature. Accordingly, all of the issues presented by the parties will be decided pursuant to the dictates of Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

The controversy underlying these motions contains all of the essential elements for a Greek drama, and accordingly a Prologue is in order.

Lifeguard Industries is a closely-held Ohio corporation primarily engaged in the

manufacture of aluminum siding. Its principal place of business is located in Cincinnati, Ohio. It was launched in 1956 by Louis and Joseph Guttman. Louis Guttman was president of the corporation for its first year; Joseph succeeded him in that office in 1957, after Louis' death, and remained its president and chief executive officer until 1974. He was also the majority shareholder until his death on March 18, 1980. Marion Guttman, Joseph's wife, was a vice-president, but never played an active role in the business. Shirley Onie, Joseph's daughter, never had more than a passing acquaintance with the business of the corporation. Fred C. Guttman, one of Joseph's sons, became the president, secretary and chief operating officer in 1974, having started with the company in 1958. Joseph, however, continued to exert influence on the affairs of the corporation until his death. (See Shareholder's Exhibit No. 17.)

Prior to Joseph's death, the corporate board of directors consisted of Joseph, Marion, and Fred Guttman. After Joseph's death, Marion Guttman and Fred Guttman were the only two members of the corporation's board of directors, notwithstanding the fact that the articles of incorporation called for a three-member board. However, as is true of many family-run corporations, corporate formalities were never strictly observed. Neither Shirley (who lives in Arlington, Virginia) nor Marion (who lives in Florida) took an active interest in Lifeguard's affairs after Joseph's death.

Beginning in mid-1980 and continuing through 1981, Lifeguard experienced operating losses and a severe cash flow problem. In December of 1981 BancOhio National Bank, the company's primary lender, cut Lifeguard's line of credit in half. On June 10, 1982 Lifeguard filed its petition under Chapter 11.

The Chapter 11 case proceeded along uneventfully until June 30, 1983, when Fred Guttman submitted a disclosure statement and plan of reorganization on behalf of the debtor. Among other things, the plan of reorganization proposed to cancel all of the existing common stock in the corporation, and to reissue new common stock to certain key employees over a five year period. If the plan is confirmed, Fred Guttman will end up with 76% of the new common stock, with the remaining 24% being divided equally between the vice-presidents of manufacturing and marketing. The other shareholders (Shirley Onie, Marion Guttman, and the Estate of Joseph Guttman) will neither retain nor receive anything under the plan.

Apparently viewing the proposed plan as a virtual declaration of war, Shirley and Marion immediately launched a campaign to protect their ownership interest in the corporation and to oust Fred from control over the business. This campaign reached a crescendo during three heated shareholders meetings held on August 8, 1983. Both sides claim that they hold a majority of the voting rights in the stock of the corporation; both sides claim entitlement to elect their respective slates of directors and officers; both sides claim the right to control and operate the business. Both sides concede that there may not be a viable corporation left to control after the dust settles. The debtor is presently in desperate need of cash, and its cash collateral agreement with BancOhio expires on August 31, 1983. The bank noted on the record its reluctance to renew this agreement voluntarily. Virtually all of the debtor's assets are subject to a security agreement held by BancOhio.

The committee of unsecured creditors, which was allowed to intervene as a party in this dispute, takes no position on the issues regarding ownership of shares or the composition of the board of directors. However, the creditor's committee strongly objects to any change in management and to the appointment of an equity security holder's committee.

Having set the stage and introduced the dramatis personae, the Court hereby submits its findings of fact, opinion and conclusions of law.

## FINDINGS OF FACT

I. *The Stock Ownership Issue*

### A. SHARES ISSUED.

1. On August 8, 1962, the Articles of Incorporation of Lifeguard Industries, Inc.

were amended so as to increase the number of authorized shares of stock from 250 to 15,000. That amendment was filed with the Secretary of State of Ohio on August 22, 1962. (Shareholder Ex. 17).

2. During the course of the trial, the shareholders offered several exhibits ( # 's 5, 6, 7, 8, 9, 11 and 16) which included stock certificates in the corporation. All exhibits were admitted into evidence. Exhibit # 16 purports to be the stock registry of the corporation and is in some disarray. Shareholder exhibit # 17, also entered into evidence, is the corporation's minute book. This minute book, while arguably not in compliance with the letter of Ohio's corporations statutes, is nonetheless a valuable historical record of the corporation and serves to fill in some of the gaps in this dispute.

3. In order to clarify the issue of who owns what stock, the Court has compiled the following record from the stock registry, the minute book and such stock certificates as were introduced into evidence. With two exceptions, all stock issued in the corporation after the August 8, 1962 issuance of 15,000 shares was issued to only four persons: Joseph Guttman, his wife Marion Guttman, his son Fred Guttman and his daughter Shirley Onie. In the following compilation, these stockholders will be identified by their first names only:

| Stock Certificate Number | Number of Shares | Owner | Status of Certificate |
|---|---|---|---|
| 4 | 15,000 | Joseph | Cancelled as per 9–25–62 agreement |
| 5 | 14,600 | Joseph | Cancelled 12–20–66 |
| 6 | 100 | Fred | Subject to 9–25–62 agreement |
| 7 | 100 | Jack Onie | Redeemed 8–30–69 |
| 8 | 100 | Justin Weber | Cancelled 11–3–72 |
| 9 | blank | blank | Cancelled |
| 10 | 14,200 | Joseph | Cancelled 1–3–67 |
| 11 | 200 | Fred | |
| 12 | 200 | Shirley | |
| 13 | 200 | Fred | |
| 14 | 200 | Shirley | |
| 15 | 13,900 | Joseph | |
| 16 | 200 | Fred | |
| 17 | 200 | Shirley | |
| 18 | 13,500 | Joseph | |
| 19 | 100 | Fred | |
| 20 | 100 | Shirley | |
| 21 | 13,300 | Joseph | |
| 22 | 100 | Fred | |
| 23 | 100 | Shirley | |
| 24 | 13,100 | Joseph | |
| 25 | 100 | Fred | |
| 26 | 100 | Shirley | |
| 27 | 12,900 | Joseph | Cancelled |
| 28 | 150 | Shirley | |
| 29 | 150 | Fred | |
| 30 | 12,600 | Joseph | Cancelled |
| 31 | 100 | Marion | |
| 32 | 100 | Fred | |
| 33 | 100 | Shirley | |
| 34 | 12,300 | Joseph | Cancelled |
| 35 | 100 | Marion | |
| 36 | 100 | Fred | |
| 37 | 100 | Shirley | |

| Stock Certificate Number | Number of Shares | Owner | Status of Certificate |
|---|---|---|---|
| 38 | 12,000 | Joseph | Cancelled |
| 39 | 7,548 | Fred | Subject to 4–16–75 agreement. Endorsed in blank by Fred Guttman. Pencilled notation: "Marion This is stock belonging to Fred that I am holding until he pays off according to agreement. JG" |
| 40 | 5,802 | Joseph | Subject to 4–16–75 agreement |
| 41 | 100 | Marion | Subject to option to purchase by Fred Guttman dated 3–15–71. |
| 42 | 100 | Shirley | |
| 43 | 5,602 | Joseph | |
| 44 | 100 | Marion | Subject to option to purchase by Fred Guttman dated 3–15–71. |
| 45 | 100 | Shirley | |
| 46 | 5,402 | Joseph | |

## B. AGREEMENTS

4. Many of the shares of stock issued by the corporation are encumbered, or purportedly encumbered, by various agreements signed by members of the Guttman family.

In chronological order, the agreements are as follows:

(a) September, 1962. An agreement signed by Joseph Guttman, Fred Guttman, Jack Onie and Justin Weber, whereby each agreed that certificates 9, 6, 7 and 8 owned by them respectively and representing 100 shares each, would not be sold or transferred (except as a gift to a spouse or child) without offering the corporation the right of first refusal. (Shareholder Ex. 17.) Certificates 7 and 8 were subsequently redeemed and cancelled by the corporation when Messrs. Weber and Onie left its employ. Certificate 9 appears not to have been issued and the blank certificate is marked "cancelled." (Shareholder Ex. 16.) Certificate 6 was cancelled and replaced pursuant to a later agreement.

(b) Certificates 41 and 44, each representing 100 shares owned by Marion Guttman, bear the typewritten notation: "This stock is subject to an option to purchase held by Fred Guttman dated March 15, 1971." No evidence was introduced regarding either the terms of this option or whether it was ever exercised. In the absence of such evidence we must assume Marion Guttman retains all ownership rights in this stock including the right to vote.

(c) Six agreements bearing the date April 16, 1975 were introduced into evidence. For purposes of clarity, we will identify them as follows:

(c)(1): Agreement between Fred Guttman and Joseph Guttman whereby upon the death of either party the survivor agrees to purchase from the estate of the decedent all stock in the corporation owned by the decedent. The sale of such stock "shall be consummated within 120 days after the appointment of an administrator or executor" for the decedent's estate. The recited purpose of the agreement is that such a purchase would be in the best interests of the corporation "for the continuity of management." The agreement specifies that "[t]his agreement is subordinate to an option held by the corporation to purchase the stock referred to herein." (Corporation's Ex. 1)

(c)(2): Agreement between Fred and Joseph Guttman and Lifeguard Industries, wherein the corporation was given the option to purchase at "any time within 30 days after the death" of either shareholder all stock in the corporation owned by the shareholder. Notice of the exercise of the option was to be in writing by certified mail to the personal representative of the decedent's estate. This agreement recited the

parties' interests as: Fred Guttman, owner of 7,548 shares and Joseph Guttman as owner of 5,802 shares. (Corporation's Ex. 2).

(c)(3): Security agreement between Fred Guttman and Joseph Guttman whereby Fred Guttman granted a security interest in 6,198 shares owned by him to Joseph Guttman to secure payment of indebtedness of $368,880 as evidenced by a promissory note of the same date. The agreement provides that Joseph holds "an irrevocable proxy to vote all of the shares of stock of Lifeguard Industries, Inc. being used as collateral under this agreement. Said proxy shall terminate only upon payment in full of said note with all interest due thereon." The agreement also provides that all rights of the secured party "shall inure to the benefit of the heirs, executors, administrators, successors and assigns of the Secured Party." (Shareholder Ex. 10).

Copies of unsigned financing statements covering these 6,198 shares, filed with the Ohio Secretary of State and the Hamilton County Recorder, on behalf of the Estate of Joseph Guttman were introduced into evidence. (Shareholder Exs. 11 and 12). These exhibits generated a certain amount of testimony and argument from both sides, but neither party alleged that any entity other than the Estate of Joseph Guttman claimed any interest in the shares. The question, rather, was who was the proper representative of the estate. Thus the questions of priority and perfection of the security interest were not at issue. See, Ohio Revised Code Ch. 1309 et seq. (U.C.C. Art. 9)

(c)(4): Promissory note signed by Fred Guttman wherein he promised to pay Joseph Guttman $368,880 in certain installments over the course of 15 years. The recited consideration in the note is the purchase by Fred from Joseph of "certain shares of common stock of Lifeguard Industries, Inc."

(c)(5): Agreement between Marion Guttman, Shirley Onie and Fred Guttman whereby Fred agrees to purchase, upon Joseph's death, all stock owned by Shirley and Marion, such sale to be consummated within 120 days after the appointment of an administrator or executor for Joseph's estate. If Shirley or Marion wished to sell their stock prior to Joseph's death, Fred was to have the right of first refusal. This agreement specifies that it is subordinate to an option held by the corporation. The recited purpose of this agreement is "that in the event of the death of Joseph Guttman it would be in the best interest of the corporation and the parties that Fred Guttman own the stock of the parties hereto...."

(c)(6): Option agreement between Shirley Onie, Marion Guttman and Lifeguard Industries, Inc., whereby the corporation was granted the option at "any time within 30 days after the death of Joseph Guttman" to purchase all of the stock owned by Marion and Shirley prior to Joseph's death. Notice of the exercise of the option was to be in writing by certified mail. (Shareholder Ex. 3)

Taken together, it appears that the intent of Joseph Guttman on April 16, 1975 was that upon his death the corporation or Fred Guttman should acquire ownership of all the corporation's stock. Unfortunately, at the time of Joseph Guttman's death, the corporation was in serious financial difficulty and could not and did not exercise its options to purchase (# (c)(2), (c)(6)). Likewise, Fred Guttman never consummated a purchase of the stock owned by his father's estate, his sister or his mother. (# (c)(1), (c)(5)).

■ Counsel for the corporation alleges that these agreements were rejected by the debtor-in-possession as executory contracts upon application of the shareholders. The question of accepting or rejecting the agreements was moot when the application was filed. All four agreements ((c)(1), (c)(2), (c)(5) and (c)(6)) were in default no later than July 15, 1981, nearly a year before the Chapter 11 petition was filed, and thus there was no agreement in effect which could be accepted or rejected under 11 U.S.C. § 365.

(d) A purported buy-sell agreement whereby Fred would purchase the stock of

Marion, Shirley and the Estate of Joseph Guttman by way of monthly installments of $2,500 payable to each of the sellers. The only evidence of this agreement comes in the form of letters dated March 17, 1982 and April 19, 1982 from Richard Fink, Florida counsel for the Estate of Joseph Guttman to Joel Moskowitz, corporate counsel, demanding payment of "the $2,500 monthly payment toward the buy-sell agreement." (Corporation's Exs. 3 and 4). Shirley Onie vehemently denies the existence of any such agreement, arguing that while four $2,500 payments were made, they were made only for the purpose of assisting Marion Guttman with IRS obligations. In support she offered Exhibit 15, another letter from Mr. Fink to Mr. Moskowitz dated November 25, 1981, in which receipt is acknowledged of revised drafts of agreements between Lifeguard, the estate and Shirley. That letter states as follows: "[I]t [is] our understanding that the acceptance of these checks does not constitute acceptance of the changes that you have made."

Whether the parties did or did not reach an agreement in late 1981 regarding a buy-sell arrangement, it is uncontested that any such agreement is now in default.

### C. OWNERSHIP OF STOCK.

5. *Marion Guttman.* Marion Guttman is the owner of 400 shares of stock. (Certificates # 31, 35, 41 and 44). Certificates 41 and 44 carry the legend "subject to option to purchase by Fred Guttman dated 3–15–71." All of Marion's stock was subject to options to purchase held by the corporation and Fred Guttman but such options were never exercised and have since expired. Likewise, any buy-sell agreement, the existence of which was never proven, would be in default. Ownership and/or possession of the stock never passed to Fred or the corporation. Therefore, Marion remains the owner of 400 shares of stock and retains voting rights therein.

6. *Shirley Onie.* Shirley is the owner of 1,450 shares of stock in the corporation. (Certificates # 12, 14, 17, 20, 23, 26, 28, 33, 37, 42 and 45). All of these shares were subject to options to purchase held by the corporation and Fred Guttman to be exercised upon Joseph Guttman's death. Such options were never exercised and have since expired. Likewise, the existence of a buy-sell agreement was never proven. Even if such agreement existed, it is now in default. Therefore, ownership and/or possession of the stock never passed to Fred or the corporation. Thus, Shirley remains the owner of 1,450 shares of stock and retains voting rights therein.

7. *Fred Guttman.* Prior to April 16, 1975, Fred Guttman was the owner of 1,350 shares, 100 of which were subject to the September 25, 1962 agreement restricting their transfer. On April 16, Fred purchased from his father an additional 6,198 shares for $368,880, evidenced by a promissory note. This purchase gave Fred 7,548 shares, or a bare majority of the stock in the corporation. Joseph, however, retained an irrevocable proxy in the 6,198 shares until the note has been paid in full. This note has not been paid. Thus, Fred retains voting rights in only his original 1,350 shares.

8. *Estate of Joseph Guttman.* Prior to April 16, 1975, Joseph Guttman owned 12,000 shares of Lifeguard stock. On that date he sold 6,198 shares to Fred, retaining the voting rights therein by virtue of an irrevocable proxy, and leaving him with 5,802 shares. After that date, Joseph made additional gifts to Shirley and Marion, thus reducing the total number of shares owned by him at his death to 5,402. The shares of a corporation are personal property. Ohio Rev.Code § 1701.24(A). Thus Joseph's shares became property of his estate and the estate retains voting rights.

9. *Others.* The other 200 shares of the corporation were owned by Justin Weber and Jack Onie, former employees. Jack Onie's 100 shares were redeemed on August 30, 1969 and thus are deemed retired. Ohio Rev.Code § 1701.36(B). The certificate of 100 shares held by Justin Weber has been marked "cancelled" and apparently has never been reissued. Thus, for purposes of this

case we find that no one has voting rights in those shares.

### D. SHAREHOLDER MEETINGS.

10. On August 1, 1983, Shirley Onie, through counsel, sent notice of a shareholder's meeting to be held at 9:00 A.M. August 8, 1983 at the offices of Wilke and Goering, counsel for Shirley Onie.

11. On August 4, 1983, Fred Guttman sent notice by telegram of a shareholder's meeting to be held August 8, 1983 at 8:30 A.M. at the office of Joel Moskowitz, corporate counsel. This action was in violation of Ohio Revised Code § 1701.41(A) requiring written notice of a shareholder's meeting not less than seven nor more than 60 days prior to the date of the meeting.

12. On August 8, 1983 at 8:30 A.M., the following parties were present at the law offices of Joel Moskowitz: Shirley Onie, Robert Goering, counsel for Shirley Onie; Mark Jahnke, counsel for Shirley Onie; Ronald Goret, counsel for the Estate of Joseph Guttman; Gary Sycalik, holder of a proxy from Shirley Onie for 100 shares; John Hevener, holder of a proxy from Shirley Onie for 100 shares; Barbara Cossu, a court reporter; Fred Guttman and Joel Moskowitz. Joel Moskowitz called the meeting to order. Shirley Onie, through counsel, presented a protest regarding lack of proper notice of the meeting. The meeting was then adjourned.

13. The second shareholder's meeting of August 8 commenced at 9:05 A.M. in the law offices of Robert Goering. The same cast of characters was in attendance minus Messrs. Guttman and Moskowitz. Shirley Onie called this meeting to order and purported to vote 13,450 shares in favor of a new board of directors to include herself, Gary Sycalik and John Hevener. The meeting was then adjourned.

14. At approximately 9:10 A.M., Fred Guttman and Joel Moskowitz arrived at Mr. Goering's office and conducted yet another shareholder's meeting. This meeting was called to order by Fred Guttman, who then read a letter from himself asking for cumulative voting of his shares. Under Ohio Revised Code § 1701.55(C) written notice of a desire for cumulative voting must be given to the president of the corporation 24 hours prior to the meeting when there has been less than 10 days notice of the meeting. Mr. Guttman's missive to himself was apparently unnecessary since Mr. Moskowitz proceeded to disqualify all shares except the 1,350 owned by Fred. Shirley Onie's shares were rejected on the basis of the April 16, 1975 agreements, Mr. Moskowitz determining that she no longer was "legal holder" of the shares. The estate's 5,402 shares were rejected on the grounds that the certificate had never been surrendered to the corporation for re-issuance in the name "Estate of Joseph Guttman," and also that there was no proper representative of the estate present. For the same reason, Mr. Moskowitz likewise found Mrs. Onie the improper person to vote the irrevocable proxy on 6,198 shares held by the estate.

Marion Guttman's shares were rejected on the grounds that no one present claimed a right to vote the shares.

As a result, only Fred Guttman's unimpaired 1,350 shares were allowed to vote and Fred thereby purportedly elected himself, Louis Epstein and James Wendell the new directors.

15. It is uncontested that Marion Guttman's shares could not be voted at the meeting since she was not present and had not given a proxy to anyone who was present.

16. We have previously found that the April 16 agreements were in default and that Shirley Onie thus remained owner of her shares. Thus, it was error to disqualify her 1,450 shares.

17. As to the question of who had the right to vote the shares owned by the estate and the proxy held by the estate, we are governed by Ohio law. Counsel for the corporation argues that since the estate is located in Florida, Florida law applies. The corporation, however, has its principal place of business in Ohio, was incorporated in

Ohio, and must operate in accordance with Ohio's laws.

■ Shirley Onie presented, both at the shareholder's meeting and at the hearing on this matter, a certified copy of a letter of administration issued by the Circuit Court of Broward County, Florida on July 11, 1983, naming her successor personal representative of the Estate of Joseph Guttman. (Shareholder Ex. 4) She also presented an order from that same court accepting the withdrawal of Marion Guttman as personal representative of the estate and a waiver of Jack Guttman (Joseph's brother) of his right to act as personal representative, and his consent to Shirley's appointment. (Shareholder Ex. 14)

Corporation counsel argues that the waiver of Jack Guttman should not be considered because Jack has since filed a petition to withdraw the waiver. That petition was filed in Broward County on August 15, 1983.

Under Ohio Revised Code § 1701.46(C), when any person has furnished to the corporation satisfactory proof of his appointment and qualification as executor or administrator under the will of a deceased record holder of the corporation's shares, such fiduciary may vote "with respect to such shares as though he were the holder of record thereof." Furthermore, even if Jack Guttman should be considered co-personal representative, subsection (E) of the same section provides that "if two or more persons have the same fiduciary relationship respecting such shares .... if only one of said persons attends the meeting, or executes a consent and no other of said persons executes an objection to such consent, then that one may act for all..." Thus, the Court finds that Shirley Onie had the right to vote the shares owned by the estate and to vote those shares subject to a proxy held by the estate.

18. Based on the above, the Court finds that the following persons had the right to vote the following shares at the August 8 meeting(s):

| | | |
|---|---|---:|
| Shirley Onie for herself: | | 1,450 |
| Shirley Onie as representative of the estate: | | |
| | Owned by the estate: | 5,402 |
| | Proxy held by estate: | 6,198 |
| | | 13,050 |
| | Fred Guttman | 1,350 |
| Shares ineligible to vote at August 8 meeting | Marion Guttman-not represented | 400 |
| | Shares retired | 200 |
| | TOTAL SHARES | 15,000 |

19. The Court further finds that prior to this litigation and again during the course of the litigation, the corporation submitted disclosure statements, both of which state that while Fred Guttman owned 51% of the stock, the proxy given his father reduced his voting rights to less than a majority. Such disclosure statements also state that the 1975 agreements are in default.

These facts raise serious concerns as to the good faith of counsel for debtor in so vigorously pursuing this issue, and the benefit which the debtor derived from the fray. The Court also has doubts as to whose interests are being represented by counsel for the debtor—those of the debtor, or those of Fred Guttman. These concerns will be more fully addressed at a later time.

II. *The Management Issue*

A. BACKGROUND

20. In late 1981 or early 1982 Shirley Onie retained Gary Sycalik of Reston, Virginia, a financial consultant and sole employee of Worldwide Capital Management Corporation, as an adviser in her personal and business affairs. Sycalik was recommended to her by an acquaintance whom she did not know well. According to Onie's deposition testimony, the extent of her contact with Sycalik during this period of time consisted of a couple of telephone calls.

21. Onie first became concerned about the financial condition of Lifeguard in approximately April of 1982. She first spoke to Sycalik about Lifeguard's financial difficulties sometime between November of 1982 and April of 1983. (*Compare* Hevener depo., pgs. 16–19 *with* Onie depo. pg. 17) Her stated purpose for consulting with Sycalik regarding Lifeguard was to obtain an infusion of capital into the company or to

find someone to purchase it. She did not make her intentions known to her brother, Fred Guttman, at this time.

22. After their initial consultation, Onie supplied Sycalik with financial statements and other information regarding Lifeguard. Sycalik in turn contacted John Hevener, Jr., a management consultant and sole employee of Hevener and Associates, Inc. in Lititz, Pennsylvania, for assistance in locating a potential buyer or investment capital for Lifeguard. Sycalik transmitted information on Lifeguard to Hevener, and thereafter in June of 1983 Hevener contacted Fred Guttman.

23. On June 16 or 17, 1983, Hevener met with Fred Guttman at Lifeguard's facility in Cincinnati. At the time of this meeting, Fred Guttman was unaware that Hevener was representing the interests of Shirley Onie, Marion Guttman and the Estate of Joseph Guttman.

The potential for an acquisition of the company and/or an infusion of capital were discussed at this meeting, and Guttman voiced his interest in both alternatives. Guttman also indicated that he intended to eliminate the equity interests of the other stockholders and to issue new stock to himself and certain key employees. (Hevener depo. pgs. 25–26).

Hevener was given a tour of the manufacturing facility, and was supplied with additional financial information. Guttman subsequently mailed Hevener a copy of the company's internal financial statement for the month ending May 31, 1983. That statement reflects a positive shareholder equity in the corporation of over $575,000. (Shareholder Ex. 19).

24. Hevener met with Sycalik and Onie soon after returning from his meeting in Cincinnati, and informed them of what he had learned. He recommended immediate and vigorous action to protect the equity interests of Onie, Marion Guttman, and the Estate of Joseph Guttman in Lifeguard. The testimony and exhibits further indicate that a plan for seizing control of the corporation and organizing a crisis management team was set into motion during this meeting or shortly thereafter.

25. At Onie's prompting, on July 5, 1983 Marion Guttman and Jack Guttman filed a petition with the Circuit Court of Broward County, Florida to resign as personal representatives of the Estate of Joseph Guttman, and to have Shirley Onie appointed as successor personal representative. That petition was granted on July 11, 1983 (Shareholder Exs. 4 and 14; see also, Hevener depo. pgs. 31–32).

26. In the meantime, Hevener made a second trip to Cincinnati where he met with Norman Slutsky, one of the attorneys for Lifeguard. He told Slutsky that he wanted the rights and interests of the corporate shareholders preserved and that he wanted to participate in the preparation of the plan of reorganization for Lifeguard. He also indicated that he had a potential buyer for Lifeguard.

He made this same representation at a subsequent meeting in Pittsburgh with William H. Schorling, attorney for the committee of unsecured creditors, at which time he indicated that there might be a possibility of a pay-out to unsecured creditors of $.25 on the dollar, or approximately $500,000.00, within a year after confirmation of the plan of reorganization. The precise details of the plan for raising this sum of money have never been disclosed to the parties or to this Court. Hevener concedes that no outside source has offered a commitment to supply such money. (Hevener depo. pgs. 33–40).

27. On July 12, 1983 Marion Guttman resigned from Lifeguard's Board of Directors. Under Article II Section 2 of the corporate code of regulations, when a vacancy occurs on the board, the president must call a shareholders' meeting within 20 days after the vacancy occurs to elect a new board.

By way of an Application for Instructions filed July 19, 1983, (Court file, document No. 100) counsel for the debtor sought guidance from the Court as to whether the shareholders' meeting mandated by the code of regulations should be held. On August 3 and 4, 1983, a hearing was held in

chambers on such application. On August 5, 1983, the Court ordered that the shareholders' meeting should be held, but that any changes in management personnel or operating procedures could not be instituted until such time as the newly-elected board of directors obtained approval of the Court. (Court file, document No. 112)

28. As noted above, on August 8, 1983 a series of three shareholders' meetings was held, and on August 9 the Application for Approval of New Management and Motion to Confirm Appointment of New Directors were filed.

## B. THE PROPOSED CHANGE IN MANAGEMENT

29. Based upon the findings of fact set forth in Part I above, this Court finds that Shirley Onie is authorized to exercise the voting rights in 13,050 of the 15,000 outstanding shares of stock in Lifeguard Industries, Inc.; that she properly exercised such voting rights during the second meeting of shareholders held on August 8, 1983; and that Shirley Onie, Gary Sycalik, and John Hevener, Jr. shall constitute the board of directors of Lifeguard until such time as new directors may be elected pursuant to Lifeguard's articles of incorporation and code of regulations.

30. The newly-elected directors propose to change the management structure of the company by installing Gary Sycalik as president, Hevener as secretary, and Onie as treasurer, with Louis A. Epstein to continue as vice-president of marketing and James G. Wendell III to continue as vice-president of manufacturing. Fred Guttman would be employed as operations manager. It is unclear what (if any) his responsibilities would be, but it is clear that Fred Guttman would decline to accept the position regardless of what his responsibilities might be.

The new board of directors has also proposed the hiring of four consultants to act as a crisis management team. While the board agrees that Sycalik will act as coordinator of this team, they do not agree on who will run the day-to-day operations as chief executive officer. Hevener and Onie

testified that Hevener will hold this position (Hevener depo. pgs. 44–45) while Sycalik has testified that he intends to hold that position. (Sycalik depo. pg. 63). Onie will play little, if any, role in the management of the company.

Both men have stated that they intend to move to Cincinnati and devote whatever time is necessary to perform their corporate duties at Lifeguard.

Hevener expects to be paid a salary of approximately $50,000 as chief executive officer. Sycalik was less specific as to his expected remuneration (Sycalik depo. pgs. 73–79). However, he estimates that the services of the consultants which the board proposes to retain will cost the corporation approximately $40,000.00 over a two- to four-month period (Sycalik depo. pg. 107).

The Court notes in passing that neither Onie nor Sycalik nor Hevener intends to invest any of their own personal assets to financially resuscitate Lifeguard.

31. The new members of the board have proposed that Epstein and Wendell remain in their present positions. Neither Hevener nor Sycalik has ever met Epstein or Wendell, nor have they determined whether Wendell and Epstein are willing to remain employed for the corporation under the new management team. Both Epstein and Wendell testified at the hearing, and both indicated a strong probability that they would leave if Fred Guttman were ousted from control. The parties generally concede, and the Court finds, that both Epstein and Wendell are exceptionally well-qualified for their positions.

Epstein has been employed with Lifeguard as the vice-president of sales and marketing since February of 1979. Prior to coming to Lifeguard, he was a sales manager for two other aluminum siding manufacturers over a fifteen year period. In 1981 Lifeguard closed 12 of its 15 distribution centers in an effort to reduce its overhead and improve its cash flow. In turn, the prime customer base for its products changed from jobbers and contractors to independent wholesalers. Many of the

wholesalers which Lifeguard now sells to were customers of the companies which Epstein previously worked for; it is reasonable to assume that many of these wholesalers would follow Epstein if he were to leave Lifeguard.

Wendell has been Lifeguard's vice-president of manufacturing since February of 1980. Prior to that he served as national sales manager for Mobil Oil's chemical division, which manufactures coatings for aluminum siding. He was also a plant manager for Crown Aluminum for four years.

From the evidence presented, the Court entertains serious misgivings as to whether Lifeguard could continue to operate if both Wendell and Epstein should abruptly resign from the company.

32. The qualifications of Sycalik, Hevener and Onie are not so apparent. According to his deposition, Sycalik has worked for at least seven entities since 1962. He was the founder of at least three of these entities. While the details of his responsibilities at these companies are sketchy, his business activities have included laser sales, land sales, satellite data-processing, holistic community development, estate planning, and management consulting.

He started Worldwide Capital Management Corporation approximately 2½ years ago. The details of Worldwide's business activities and financial condition are equally sketchy. Sycalik was elusive as to the amount of his salary from the company. Because of a loss of records, the company has not yet filed its 1982 tax returns.

It is apparent that Sycalik knows little, if anything, about operating a manufacturing facility. His experience in manufacturing consists of eight months as a production planner in the 1960's.

Hevener's work history was better defined. He is certified under Pennsylvania law as a public accountant. During the 1960's he was the chief executive officer of an electrical construction firm, and later served as chief executive officer of a company which provided accounting and data processing services to the electrical construction industry. For the last three years he has been the chief financial officer and personnel director of Peneast Corporation, a stainless steel foundry and nickel recycling operation with yearly gross sales of three to six million dollars. His management consulting company, Hevener Associates, Inc., has not been very active over the past twelve months. Hevener concedes that it has not shown a profit for at least ten years. His experience in operating a manufacturing facility appears to be limited.

Mrs. Onie is the president and majority shareholder of Embassies International, a corporation engaged in the sale of military spare parts and equipment. While Embassies International has gross sales of approximately one million dollars per year, it has not filed a tax return since it was incorporated in 1980. Mrs. Onie offered no satisfactory explanation for this failure to file tax returns. She concedes that she has no knowledge of manufacturing, finance, or accounting.

She also freely admits that she knows virtually nothing about the business or personal backgrounds of Sycalik, Hevener, or the consultants whom they propose to retain. Notwithstanding this lack of knowledge, on August 3, 1983, Onie and Marion Guttman both executed agreements with Worldwide Capital Management Corporation whereby Worldwide would receive hourly fees, out-of-pocket expenses, and 50% of any equity which it succeeded in salvaging for Onie, Marion Guttman, and the Estate of Joseph Guttman in exchange for Worldwide's best efforts to protect their shareholder rights. To date, Onie has paid Worldwide in excess of $20,000, $7,500 of which was paid from the Estate of Joseph Guttman. (Sycalik depo. pgs. 104–105). Part of this money has been distributed to Hevener and the attorneys representing Onie, Marion Guttman, and the Estate of Joseph Guttman.

Onie, Sycalik and Hevener share certain characteristics in terms of their qualifications to operate Lifeguard. None of the three has any knowledge of the aluminum siding industry; nor do they have a source

of financing to solve Lifeguard's pressing financial problems; nor do they have a working knowledge of the business; nor do they have a clear plan of action for operating the business and solving the problems which they believe exist; nor do they have a clear idea of how they will utilize the services of the consultants which will compose their crisis management team.

Only two of those four consultants testified at the hearing. The Court was impressed with the experience and qualifications of George Price, who has provided financial and management services to a number of corporations involved in Chapter 11 reorganization proceedings. It must be noted, however, that Mr. Price's services to Lifeguard would be limited to only one week per month over the next two months.

The Court was much less impressed with the credentials of Lawrence H. DeBivort. His description of the services which he would render to the debtor was at best opaque. No other competent evidence was presented as to the qualifications of the other two consultants or the services which they would perform.

33. Onie, Sycalik and Hevener argue that Lifeguard is no longer a viable corporation, and that mismanagement by Fred Guttman is almost exclusively to blame for its demise. Among other things, they cite poor accounting procedures, inadequate financial controls, and unwise business decisions as justifications for immediately ousting Fred Guttman from control.

Based upon the evidence presented, the Court agrees with their contention that neither Fred Guttman nor Anita Gabor, company accounting manager, has an adequate grasp of the details of Lifeguard's financial condition, either past or present. Indeed, no intelligible explanation of the company's present financial condition has been presented to this Court. Two financial statements, both dated May 31, 1983, were introduced at the hearing. The first was prepared internally by Gabor and was submitted to this Court as a regular monthly report. (Shareholder Ex. 19) The second was prepared by the company's outside ac-

counting firm, and was attached to the disclosure statement and plan of reorganization filed June 30, 1983. (Shareholder Ex. 18). Numerous discrepancies exist between the two statements, the most noteworthy concerning inventory and stockholder equity.

Shareholder Exhibit 19 lists "Merchandise Inventory at FIFO" as $1,968,774.60, and "Total Stockholders Equity" as $575,098.30. Shareholder Exhibit 18 lists "Merchandise Inventory at FIFO" as $979,213.20 and "Total Stockholders Equity" as minus $958,186.77. Gabor attributed these enormous discrepancies to some 44 "adjusting entries" (Corp. Ex. 5) which were figured into the VonLehman, Kist & Company statement, but which were not available when the internal statement was prepared. The largest of these adjusting entries was a $711,000 reduction in the dollar-amount of inventory. The $711,000 figure was Von Lehman's estimate of the loss incurred by the company from a theft ring involving certain employees which was uncovered in January, 1982. Fred Guttman admitted that neither he nor anyone else knows the exact amount of the theft loss.

A decline in the value of aluminum was also cited as a reason for the inventory discrepancy. However, the testimony of Gabor and Guttman fails to establish whether these two factors were the sole reasons for the discrepancy; indeed, the evidence indicates that a discrepancy of tens of thousands of dollars remains after these two factors are taken into account.

Fred Guttman was unable to explain many of the other discrepancies in these financial statements when questioned about them in his deposition, and was unable to explain what many of the line items in these statements mean.

Based on the above, this Court declines to credit either of the May 31, 1983 financial statements as being an accurate representation of the company's financial condition or its present net worth.

34. Notwithstanding his lack of knowledge regarding the company's finances and

the confused state of Lifeguard's financial picture, the evidence establishes that Fred Guttman has made a concerted effort to turn the business around, and that these efforts have met with some success.

As of 1980 the company operated fifteen regional warehouses, had 25 to 30 salesmen, 3 regional managers, and $11 million in yearly sales. The increased debt burden and decrease in sales caused by the rise in interest rates required that Guttman make some difficult decisions in 1980 and 1981. To cut down overhead and improve cash flow, the sales force was reduced dramatically, and 12 of the 15 warehouses were closed. However, the benefits from these actions were not quickly realized due to the expenses inherent in closing the warehouses. Other cost-saving measures were instituted, including the termination of the company's vice-president of finance, material specialist, and certain office personnel. Guttman cut his own salary from $115,000 per year to $85,000 per year.

The company incurred additional financial setbacks in the form of continuing theft losses (which are still being investigated) and the reduction of their line of credit by BancOhio. Because the company was forced to do business with their suppliers on a cash basis, and because the economy failed to improve, sales continued to decrease.

Primarily due to Guttman's efforts, however, the company has increased its highly profitable tolling operations, which consists of custom painting for other manufacturers. It has sought and obtained distributorship rights for vinyl siding, and has established new outlets for the sale of its aluminum siding. It is undisputed that the company will probably show a profit this year although the amount is subject to question due to the unreliability of its financial statements.

The suggestion has been made that the company should have phased out its aluminum siding business longer ago and switched to the production of vinyl siding, which is expected to hold 60% to 70% of the siding market by 1985. This suggestion was effectively rebutted by Guttman, who noted that the cost of machinery for the production of vinyl siding would cost at least $1 million alone and the product change-over would require a two-year lag time. Furthermore, there are presently 21 manufacturers of vinyl siding in the U.S. and 6 in Canada. The competitors are large corporations, the technology involved is difficult, and the industry presently has a large excess capacity.

35. Based upon his testimony, as well as that of Wendell and Epstein, the Court finds that Fred Guttman has a good working knowledge of the aluminum siding industry, has performed capably as a manager of Lifeguard's business activities, and has made a significant personal and financial commitment to turning the company around. Based upon the above findings and all of the evidence presented in this case, the Court further finds that the best interests of creditors would not be served by allowing the new slate of officers to take over the day-to-day operations of the business, at least not at this critical time.

## OPINION AND CONCLUSIONS OF LAW

The issues raised by the parties in this dispute are as difficult as they are unique. Counsel for Onie has argued that the ownership rights held by the shareholders include the right of the majority to change management and that such rights may not be abridged under the laws of Ohio. Counsel for the debtor has invited the Court to ignore the state law rights of the shareholders and simply abstain from deciding the issues presented.

The Court cannot accept either argument. Unfortunately, neither the Bankruptcy Code nor the case law provides extensive guidance for balancing the parties' competing interests. Indeed, neither the Court nor the parties have found any reported cases which bear any resemblance to the situation at hand.

However, the case law does provide certain basic principles which are applicable

in this proceeding. There is little question that shareholders of a corporate debtor-in-possession retain their state law rights to control a corporation, and that such rights cannot be lightly cast aside by this Court. *In re Lionel Corporation,* 30 B.R. 327, 10 B.C.D. 960 (Bkrtcy.S.D.N.Y.1983); *In re Gilece,* 1 B.R. 762 (Bkrtcy.E.D.Pa.1980).

■ However, it is equally apparent that the shareholders' right to control a Chapter 11 debtor-in-possession is not without limitations under the Bankruptcy Code. Section 1107(a) specifically provides that a debtor-in-possession shall have all (or almost all) of the rights, powers and duties of a trustee subject *"to such limitations or conditions as the court prescribes ..."* Section 1108 states that "unless the Court orders otherwise, the trustee may operate the debtor's business." At least two courts have interpreted the language of § 1108 as prohibiting a court from interfering with a trustee's business judgments in operating a debtor's business. *In re Curlew Valley Associates,* 8 B.C.D. 495, 14 B.R. 506 (Bkrtcy. D.Utah 1981); *In re Airlift International, Inc.,* 18 B.R. 787, 8 B.C.D. 1196 (Bkrtcy.S.D. Fla.1982). Those same two courts also noted *in dicta* that no similar restriction can be gleaned from the language and legislative history of § 1107(a).

This same conclusion was reached in *In re Lyon & Reboli, Inc.,* 24 B.R. 152, 9 B.C.D. 916 (Bkrtcy.E.D.N.Y.1982), wherein it was held that § 105 and § 1107(a) of the Code vest the Court with the authority to review the propriety of salaries paid to the debtor-in-possession's officers. Judge Parente's reasoning is worth repeating here:

> At issue is not the wisdom or efficacy of a business decision, but the propriety of insiders bestowing upon themselves compensation which may be excessive and detrimental to the creditors. The corporations in question are closely held, and the actions of the officers are subject to little, if any, internal review. Prior to the confirmation of a negotiated plan which might fix the compensation of the officers, the court has an obligation, when application is made by a party in interest, to pass upon the propriety of the salaries of insiders where there is the potential for, and the prima facie appearance of, abuse.

24 B.R. 152, 9 B.C.D. at 917

■ While the propriety of salaries is not at issue here, there have been allegations of, and certainly potential for, abuse of the corporation by insiders to the detriment of both the creditors and the equity security holders. Thus, the Court has an obligation to scrutinize the actions of the corporation when asked by a party in interest to do so.

■ We heartily concur in the view expressed in the above-cited decisions that business judgments should be left to the board room and not to this Court. It is not this Court's responsibility to determine whether Lifeguard should increase its tolling operations, change its product lines, increase its distributing activities, cut back its sales force, or manufacture vinyl siding. It *is* this Court's responsibility to protect creditors' interests from the actions of inexperienced, incapable, or foolhardy management, whether old or new.

■ It may well be that Shirley Onie's management team might ultimately usher in a new era of unprecedented prosperity at Lifeguard. But no concrete means or plan have been suggested for achieving this promised result. Indeed, the new management slate has demonstrated no real understanding of the immediate problems facing the business, or for that matter, the business itself. If they fail in their efforts, only the creditors lose. We do not believe that such unwilling gamblers should be required to take that risk.

Accordingly, the motion to confirm the appointment of new directors is GRANTED; the application for approval of new management is DENIED. Since Shirley Onie is now effectively in control of the board of directors of the corporation, the Court views an equity security holders committee as unnecessary, and accordingly her motion to appoint such a committee is DENIED.

The Court further ORDERS as follows:

1. Fred Guttman, James Wendell, III, and Louis Epstein shall continue as President, Vice-President of Manufacturing, and Vice-President of Marketing and Sales at their present salary levels. They shall have sole and exclusive authority and responsibility for the day-to-day operation of Lifeguard Industries, Inc. Such authority and responsibility shall continue until the confirmation of a plan of reorganization or the expiration of four months, whichever occurs first. At such time the board of directors may install new officers of their choosing pursuant to the corporate code of regulations.

2. The newly-elected board of directors may propose a plan of reorganization on behalf of Lifeguard, such plan to be submitted within the next 60 days. The expense of preparing such plan shall be reimbursed by the corporation, subject to the approval of the Court. It may negotiate for the sale of the business, seek out sources of financing, engage in future planning for the business, and take any action pursuant to the terms of the Bankruptcy Code which it deems appropriate; the expenses for such activities and the retention of persons to engage in such activities shall be subject to the approval of the Court.

The members of the board of directors shall not direct, undertake, or in any way interfere with the day-to-day operations of Lifeguard until such time as a plan of reorganization is confirmed or the expiration of four months, whichever occurs first. Any inquiries, concerns, suggestions, or other communication of the members of the board of directors regarding the day-to-day operation of the corporation shall be set forth in writing and sent to Fred Guttman's attention. Fred Guttman shall respond in writing to such communications within 36 hours of their receipt. A copy of all such communications and replies thereto shall be served upon Mr. William H. Schorling, attorney for the creditors' committee.

3. Fred Guttman shall serve upon each member of the board of directors a copy of the debtor's regular monthly report filed with this Court. In addition, on October 1,

November 1, and December 1, 1983 Fred Guttman shall serve the board of directors, Mr. William H. Schorling, and the Court with a written summary of significant sales, manufacturing and marketing activities of Lifeguard Industries which occurred during the previous month.

4. Within the next 30 days, the debtor-in-possession shall, and any other party may, submit a written estimate of the cost of performing an accounting review of the debtor by an independent certified public accountant. A hearing will be held on September 29, 1983 at 2:00 P.M. in Room 721 United States Post Office and Court House, Cincinnati, Ohio, to determine the advisability of such a review.

IT IS SO ORDERED.