In the Matter of SOUTHERN
BIOTECH, INC., Debtor.

Bankruptcy No. 82–1078.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Dec. 23, 1983.

Zala Forizs, St. Petersburg, Fla., for trustee.

## ORDER ON TRUSTEE'S APPLICATION TO ASSUME CONTRACT AND LEASE and ORDER ON APPLICATION TO ACQUIRE CONTROLLING INTEREST IN BIO PHARM UNIVERSITY CENTER

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a business reorganization case in which this Court, upon motion filed by the Creditors' Committee, removed the management and, pursuant to § 1104 of the Bankruptcy Code, appointed Angel Santolla as Trustee for the estate of Southern Biotech, Inc., formerly known as Southern Medical and Pharmaceutical Corporation (Southern Biotech).

The matter under consideration is an unusual request by the Trustee who seeks permission to purchase all the outstanding stock in a non-debtor corporation, a request which is vigorously opposed by certain administrative claimants.

In order to put the matter under consideration in an understandable context, a brief recitation of the historical events preceding the application under consideration is in order.

Prior to the commencement of this case, Southern Biotech engaged in the manufacture of interferon, a protein substance produced by virus invaded cells that prevents the reproduction of the virus. The substance is considered to be a potential therapeutic agent, helpful, if not to cure, but at least to retard the spread of certain types of cancer and it is also considered to be a potential help to treat other diseases such as multiple sclerosis (MS) for which so far, there is no effective cure. In addition, Southern Biotech also operated two plasmapheresis programs. This is a process whereby blood is extracted from the donor, the protein portion of the blood is separated from the red blood cells, resuspended in salt water and thereafter returned to the donor. The plasma, which is a protein rich component, is sold to pharmaceutical companies for conversion to marketable substances. This program was operated by Southern Biotech at two correctional institutions maintained by the State of Florida, one located at Avon Park and the other at Raiford, known as Union Correctional Institution (UCI). Both programs were closed down sometime ago. The Trustee shortly after his appointment attempted to resume the plasmapheresis program at the UCI facility. However, this Court having found that a trustee is unable to assume the executory contract the estate had with the UCI correctional institute, refused to grant the Trustee's request to assume. This ruling was based on the fact that the Trustee was unable to assure future performance of the contract which is, of course, one of the conditions for assumption of an executory contract imposed by § 365(b)(1)(C). This conclusion was based on the specific finding by this Court that the program cannot be conducted in accordance with "good and sound medical practice" due to the potentially high incidents of AIDS, a deadly incurable disease, in addition to other diseases such as serum hepatitus, malaria frequently occurring in many paid donor programs conducted in the close confinement of a correctional institute.

As a result, the Trustee no longer operates and conducts any plasmapheresis program at this time and since the manufacture of interferon was also discontinued, the Trustee does not conduct any business operation in an orthodox sense and the estate derives no income from any source at this time.

As a result of previous operations of the two plasmapheresis programs, the estate incurred substantial administrative expenses to the State of Florida in connection with the two plasmapheresis programs discussed earlier; rent obligations due to the landlord whose premises Southern Biotech occupied, which, however, are no longer occupied by the Trustee, albeit, some of the tangible assets of the estate still occupy part of the premises. In addition there is an administrative claim by the former attorney for the Creditors' Committee who filed an Applica-

tion for Allowance on which no action has been taken so far.

The Trustee, in order to re-establish Southern Biotech as a viable ongoing business, explored the possibility of resuming a plasmapheresis program conducted with paid donors, but no longer in correctional institutes but at the plasma centers commonly referred to as street centers. In connection with these efforts, the Trustee approached Bio Pharm University Center, Inc. (Bio Pharm) and negotiated a contract which indirectly forms the basis of the Trustee's Application under consideration. The unusual feature of the action proposed by the Trustee is based on the fact that the Trustee does not propose to resume the plasmapheresis operation directly and sell the plasma to Bio Pharm, but proposes to purchase all the outstanding stock in Bio Pharm which, in turn, would conduct the plasmapheresis program. In order to understand the reason for this approach, a brief explanation is in order. Bio Pharm is a successor of Bio Pharm International, in which Mr. Singh is a majority stockholder and who also functioned and is still functioning as president of both corporations. Bio Farm International obtained a contract from Hyland Therapeutics Division of Travenol Laboratories, Inc., a Delaware corporation (Hyland), whereby Hyland agreed to purchase a minimum of 2,000 liters of plasma per month. The contract is a non-cancellable one year contract under which Hyland agreed to pay to Bio Pharm International ten days from the date of submission of an invoice and even prior to shipment for the plasma and related blood products at the following prices:

| Fresh Frozen Normal Plasma | Price per liter |
| --- | --- |
| Blood Group O | $30.00 |
| Blood Group A, B, AB | $35.00 |
| TETANUS HYPERIMMUNE PLASMA | |
| Blood Group O | $33.00 |
| Blood Group A & B | $38.00 |

Bio Pharm International also holds a lease on the premises owned by 3500 Fletcher Company, University Professional Center.

Although there is no direct evidence in this record, it is without dispute that Bio Pharm International did or will assign both the Hyland contract and the lease to Bio Pharm University Center, the proposed operator of a plasma center. As noted earlier, in order to accomplish this, the Trustee seeks permission to purchase all of the outstanding stock in Bio Pharm University Center from the stockholders for a total purchase price of $50,000 cash and assumption of two notes of $10,000 each, one payable to B.S. Bedi and the other to Jagdip Singh. The end result of this proposed transaction would be, if approved, that the Trustee will be the owner of all the outstanding stock in Bio Pharm University Center and would be the sole, albeit indirect, beneficiary of the Hyland contract and also the lease covering the premises at the University Professional Center. In order to accomplish this, the Trustee needs the release of $150,000 now held in escrow by the attorney for the Debtor. The escrowed funds constitute monies realized from the sale of certain assets of the Debtor. According to the Trustee, if his Application is approved, Bio Pharm will commence forthwith a plasmapheresis operation based on the blood obtained from paid donors, primarily students attending the University of South Florida, which is located directly across from the proposed plasma center. The Trustee also proposes to engage the services of Mr. Singh, who will be designated as a "responsible person" in charge of the operation and who will ultimately set up five additional facilities in Florida, Texas and Georgia.

In support of the Application under consideration, the Trustee presented the testimony which indicates the following: Mr. Singh is an experienced operator of plasmapheresis programs; that he is accepted and has been in the past accepted by the regulatory agencies, i.e. the Federal Drug Administration (FDA) and the comparable state agencies as a competent person to function as the "responsible person" to supervise and run plasmapheresis programs. There is no doubt that Mr. Singh would be acceptable to run not only the initial facility in Tampa, but also the other additional facilities contemplated by the parties. The evidence is

uncontradicted that Mr. Singh is willing to sign an exclusive employment contract for one year, a customary term in the industry and he is willing to also sign a non-compete agreement, a feature of great importance because of his technical know-how and expertise indispensable to the performance of the Hyland contract and to the operation of the other facilities contemplated. Without his participation, the entire program would be meaningless because the Trustee has no expertise or technical knowledge to operate the programs and the ability to replace Mr. Singh is questionable. There is no question that Mr. Singh is basically a key ingredient to the success of this program.

This leaves for consideration the evaluation of the economic soundness of the program proposed by the Trustee. It appears from the pro-forma projection of the contemplated operation submitted by the Trustee (Trustee's Exh. # 7), the program contemplates initially an immediate resumption of a plasmapheresis program in Tampa, at the location indicated earlier. The projection initially estimates a monthly production of 1,000 liters of plasma which will increase to 2,000 liters by March of 1984. According to the projection, production will eventually reach 24,000 liters per year. There is evidence that the optimum production is 2,000 liters per month inasmuch as any additional increase in production would require additional overhead expenses, increased payroll unless the production increases to 3,000 liters per month. Any lesser increase would not be commensurate with the return.

Based on the staggered expansion program proposed by the Trustee commencing January, 1984 and ending May, 1985, all of the facilities are expected to produce a total of $129,600 liters per annum. Assuming a projected sales price of $35.20 per liter, the operations would produce a gross annual revenue of $4,561,920. The funds necessary to generate this income when all the facilities are in full operation are projected to be $3,709,428, thus in turn producing net cash from the operation of $852,492 per year. While it is true that at the initial stages of the program there will be a negative cash

flow up to March, 1984 and again periodic negative cash flows through the life of the program due to the initial operating cost of opening new facilities, the net cash flow from the operation of the facilities plus the initial cash on hand of $30,000 plus the escrow funds of $150,000 would produce a cumulative cash balance at the end of the program of $287,735 (Trustee's Exh. # 7).

These projections are based on a projected price of $34 per liter for source plasma to be paid, not only by Hyland, but possibly some other purchasers of the product. In addition, hyperimmune derived from the plasmaperhesis operation is projected to sell for the sum of $37 per liter. It is estimated that any given donor will produce 60% normal plasma and 40% hyperimmune bi-products resulting in a weighted average price of $35.20 per liter (Trustee's Exh. # 7, Schedule 1).

It is further assumed that that average donor will furnish blood yielding approximately 650 milimeters of plasma per donation. These projections are based on the track record of a former facility operated by Mr. Singh in a nearby location. The former facility had only 18 beds and was further removed from the University, yet it produced 1,500 to 1,800 liters per month. The Tampa facility is planned to be a 30 bed facility and will be located directly across from the University, an important factor inasmuch as the bulk of the donors are expected to be students attending the University.

It is clear from the evidence presented that this program proposed by the Trustee will be economically feasible only if Bio Pharm is able to establish and set up all six facilities within the time frame projected. It is clear that the operation will not be feasible by operating only the one facility here in Tampa. As noted earlier, the Trustee currently has no ongoing operation and has no expectation to have one except for the proposed project. As a result, the Trustee currently is not producing any income. Absent a resumption of an income producing operation, the Trustee has no alterna-

322

tive but to propose a total liquidation of the assets of Southern Bio Tech. A liquidation most likely will not produce any measurable or meaningful benefit to anyone but the administrative claimants who are opposing the project proposed by the Trustee.

According to the schedule prepared by the Trustee, the assets of Southern Bio Tech consist of the following items:

| | |
|---|---:|
| Cash – Regular Checking | $ 30,000 |
| Escrow | 150,000 |
| TOTAL | $180,000 |
| Insurance Claim | 25,000 |
| Inventory – Interferon | 550,000 |
| Office Furniture & Equipment | 20,000 |
| Automobile | 15,000 |
| Plasma Equipment | 60,000 |
| Lab Equipment | 100,000 |
| TOTAL | $950,000 |

As it appears, the largest item in the Trustee's inventory is the interferon inventory valued at $550,000. It is not difficult to visualize that a quick sale of this inventory would not produce the value placed on it by the Trustee and, according to the Trustee's estimation, it can only be sold at less than $10 per unit. The Trustee's ability to maximize the recovery from liquidating the interferon inventory is closely tied to the Trustee's ability to enter into the projected transaction. The project would give the Trustee time to market the interferon inventory in an orderly fashion ·rather than dump the entire inventory on the market and liquidate it in a quick sale.

The proposed transaction is clearly unorthodox and unusual since Trustees, as a general rule, sell assets rather than purchase assets. The nature of the assets sought to be purchased in this instance makes the transaction even more vulnerable to attack. What the Trustee proposes to buy is an intangible item, the value of which is, at this time, nil and depends entirely on the success of the program proposed under the arrangement with Mr. Singh. This is not an instance when a trustee uses corporate funds to purchase a piece of equipment needed for the continuing operation of the business, but is rather an attempt to buy stock in a corporation without any track record and without any

assets. For this reason, the Court would be amiss not to scrutinize the soundness of the proposition and the nature of the opposition to the project. Furthermore, the Court should consider the alternatives available to the Trustee.

Considering the nature of the opposition, it is clear that it comes from a class of creditors whose interest is basically inimical and hostile to the interests of the general estate. This is so because they assert their claims as first priority items which, no doubt, would be paid in full, even on a quick liquidation of all the assets of Southern Bio Tech. The Trustee, if he is able to obtain the escrow funds would have $180,000 cash plus the remaining assets which, on liquidation would include the proceeds from the interferon inventory. These funds would produce sufficient sums to pay in full the first priority items, that is, the claims asserted by the objecting parties. However, whether or not such course of action would produce sufficient funds which would give a meaningful dividend to the unsecured creditors is highly questionable and is very doubtful. This is, however, not a controlling factor and the Court must consider whether or not the course of action proposed by the Trustee is permissible under the Code and if so, to what extent this Court should evaluate the economic soundness of the program and question the business judgment of the Trustee.

By virtue of § 1108 of the Code, the Trustee may operate the debtor's business and there is no question that the operation of the business was planned to be the norm. *See, H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 404 (1977); U.S.Code Cong. Adm.News,* 1978, p. 5787. Accordingly, the court will not entertain objections to the trustee's conduct of the affairs of the estate where the conduct involves a business judgment made in good faith and made on a reasonable basis and within the scope of his authority. Thus, as long as the proposed undertaking is based on well articulated reasons supported by facts and is not on unsupported, speculative assumptions or

based on decisions made arbitrarily and capriciously without any basis, the Court will not inquire into the basis for the reasons for the decision. *In re Airlift International, Inc.,* 18 B.R. 787 (Bkrtcy.Fla.1982). These premises are clearly valid and preclude any inquiry into the economic soundness of a business decision of the Trustee if the decision involves matters directly involved in the ordinary conduct of the Debtor's business. The Code expressly authorizes the Trustee to use, sell, or lease properties of the estate in the ordinary course of business without leave of court. § 363(b), (c)(1) of the Bankruptcy Code.

■ The matter under consideration has, of course, an unusual twist because it involves not a request by the Trustee to use, sell or lease properties of the estate, but to purchase assets in order to continue to operate the business of the debtor. If the proposed purchase would involve capital assets such as inventory, equipment or fixtures needed for the continuing operation of the business, this Court would not give a second thought and would not ordinarily require that the Trustee obtain a prior approval of the proposed transaction. This is not the case, however, in the present instance. On the contrary, it is clear that the transaction proposed by the Trustee does not involve an acquisition of inventory, fixtures or equipment needed to carry on the business of the debtor, but rather the acquisition of corporate stock in a non-debtor corporation. The value of the stock at this time is totally unknown and most likely nil and its ultimate value depends on the success of the proposed project involving the plasmapheresis program to be conducted by Bio Pharm, the corporation controlled by the Trustee if his Application is approved by this Court. Thus, it is evident that this Court must first consider whether or not the proposed action is legally permissible, i.e. either expressly or impliedly authorized or at least not prohibited by the Code before it considers the economic soundness of the project. There is nothing in the Code which deals with this subject either directly or indirectly. The fact that there is no express authorization in the Code should not preclude authoriza-

tion to enter into the transaction unless there is specific prohibition against the proposed transaction. *In re Prudence Co., Inc.,* 14 F.Supp. 249 (D.C.E.D.N.Y.1936). In this case, the District Court for the Eastern District of New York held that there was nothing in the Bankruptcy Act which prohibited the Trustee in a pre-Code Chapter X case to organize a subsidiary corporation for the purpose of procuring insurance through this newly organized corporation for the properties of the debtor. Although this is a pre-Code case, there is nothing in the Code or in the legislative history which would require a different result.

■ Having concluded that the transaction proposed by the Trustee is legally permissible due to the peculiar nature of this transaction, a brief comment on the economic soundness and on the consequences of the alternatives are in order. There is no question that the transaction proposed by the Trustee involves some risks. It is equally clear that there is a possibility that the Trustee will spend cash of the estate or cash on hand, or the corporate stock may ultimately turn out to be worthless. On the other hand it is equally clear that there is hardly any alternatives available to the Trustee if there is to be a reorganization of this debtor. The objecting parties do not, of course, care about any reorganization but prefer, for obvious reasons, a prompt liquidation of all assets of the debtor since this would, as they believe, assure a full payment of their claims by virtue of the priorities granted by § 507(a)(1) of the Bankruptcy Code. While their position is clearly understandable, it does not represent the interest of the estate in general and it is without merit. The objection interposed by the administrative claimants to the proposed action is without merit for an additional reason. The objecting parties are general unsecured creditors, albeit, they claim administrative priority under § 507(a) of the Code. As such, they do not have a vested property right in the funds currently available to the Trustee including to the $150,000 still held in escrow. Next, there is no express statutory

requirement that holders of unsecured claims be provided "adequate protection" of § 361 which may be required under §§ 362, 363 or 364 of the Code, to protect the interest of an entity who *has an interest* in the property which is affected by a proposed action by the Trustee.

Thus, any possible impairment of the recoupment anticipated by unsecured creditors even if their claim is a priority claim requires no adequate protection. *In re Garland Corp.,* 6 B.R. 456 (Bkrtcy.App.D.Mass. 1980). Moreover, there is more than ample evidence in this record that the liquidation of the free assets of this Debtor are more than sufficient to take care of and satisfy all administrative claims which are ultimately allowed in this case even if the proposed transaction fails and the monies invested by the Trustee are lost.

In sum, having considered all aspects of this case, not without some difficulties fraught with some doubts, this Court is satisfied that the Trustee should be permitted to enter into the proposed transaction with Bio Pharm under the terms and conditions set forth in the Trustee's Application.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Trustee's Application to Assume Contract and Lease be, and the same hereby is, granted. It is further

ORDERED, ADJUDGED AND DECREED that the Application to Acquire Controlling Interest in Bio Pharm University Center filed by the Trustee be, and the same hereby is, granted and the Trustee is permitted to enter into the proposed transaction with Bio Pharm under the terms and conditions set forth in the Application.